**Case No. 26-50181**

In The
# United States Court of Appeals
For The Fifth Circuit

WILD TYPE, INC. D/B/A WILDTYPE AND UPSIDE FOODS, INC.,

*Plaintiffs – Appellants*

*v.*

JENNIFER SHUFORD, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF STATE HEALTH SERVICES; CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS EXECUTIVE COMMISSIONER OF THE TEXAS DEPARTMENT OF HEALTH AND HUMAN SERVICES COMMISSION; KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS, IN HIS OFFICIAL CAPACITY; DELIA GARZA, IN HER OFFICIAL CAPACITY AS THE COUNTY ATTORNEY OF TRAVIS COUNTY,

*Defendants – Appellees*

On appeal from the U.S. District Court for the Western District of Texas,
No. 1:25-cv-1408; Honorable Alan D. Albright, District Judge

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

**INSTITUTE FOR JUSTICE**

Marco Vasquez Jr.
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936

Paul Sherman
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320

*Counsel for Plaintiffs-Appellants*
*Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel for Plaintiffs-Appellants certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this court may evaluate possible disqualification or recusal.

**Defendants-Appellees**

Jennifer A. Shuford, *in her official capacity as* the Commissioner of the Texas Department of State Health Services

Cecile Erwin Young, *in her official capacity as* the Executive Commissioner of the Texas Health and Human Services Commission

Ken Paxton, *in his official capacity as* Attorney General of Texas

Delia Garza, *in her official capacity as* County Attorney of Travis County

**Counsel for Defendants-Appellees**

OFFICE OF THE ATTORNEY GENERAL OF TEXAS

Douglass Bowie Duncan
Christopher John Pavlinec
Zachary L. Rhines
Brian B. Tung
Ali Thorburn
Grey W. Johnston

TRAVIS COUNTY ATTORNEY'S OFFICE

Elaine Agnes Casas
Susana Naranjo-Padron
Todd A. Clark

**Plaintiffs-Appellants**

Wild Type, Inc. d/b/a Wildtype

UPSIDE Foods, Inc.

**Counsel for Plaintiffs-Appellants**

INSTITUTE FOR JUSTICE

Paul Sherman
Marco Vasquez Jr.
Arif Panju

*/s/ Marco Vasquez Jr.*
*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

I hereby certify that Plaintiffs-Appellants Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc. have no parent corporation and that no publicly held corporation owns 10% or more of their stock.

*/s/ Marco Vasquez Jr.*
*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would be helpful because this case presents important questions, including the proper standard for evaluating motions for preliminary injunction when a plaintiff asserts a federal constitutional claim, irreparable harm in the form of economic and constitutional injuries, and the scope of a federal statute that expressly preempts certain state laws.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ v

TABLE OF AUTHORITIES ........ vii

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF ISSUES ........ 3

INTRODUCTION ........ 4

STATEMENT OF THE CASE ........ 6

STANDARD OF REVIEW ........ 12

SUMMARY OF ARGUMENT ........ 13

ARGUMENT ........ 15

I. The district court erred by denying Wildtype and UPSIDE's motion for a preliminary injunction on their Commerce Clause claim ........ 15

A. The district court applied the wrong legal standard ........ 16

1. *When a plaintiff moves for a preliminary injunction on a constitutional claim, the district court must analyze likelihood of success* ........ 16

2. *The district court's failure to analyze likelihood of success was not harmless* ........ 21

B. Wildtype and UPSIDE are suffering irreparable harm ........ 26

1. *Wildtype and UPSIDE are suffering irreparable economic injuries* ........ 28

2. *Wildtype and UPSIDE are also suffering an irreparable constitutional injury* ........ 34

3. *The district court offered no valid basis to reject irreparable harm* ........ 37

C. The equities favor preliminary relief ........ 40

II. The district court erred by denying UPSIDE's motion for preliminary injunction regarding its Supremacy Clause claims ........ 43

A. The PPIA preempts additional or different state requirements, and there is no categorical sales-ban exception ........ 44

B. UPSIDE's cultivated chicken is a "poultry product" prepared at an "official establishment." ........ 46

C. SB 261 is likely preempted under the PPIA's Ingredients Clause ........ 48

D. SB 261 is likely preempted under the PPIA's Facilities Clause ........ 51

CONCLUSION ........ 56

CERTIFICATE OF SERVICE ........ 58

CERTIFICATE OF COMPLIANCE ........ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
878 F.2d 806 (5th Cir. 1989) .......... 33

*Allstate Ins. Co. v. Abbott*,
495 F.3d 151 (5th Cir. 2007) .......... 21, 24

*Armour & Co. v. Ball*,
468 F.2d 76 (6th Cir. 1972) .......... 45

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017) .......... 48, 53, 54, 55

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .......... 35, 41

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .......... 38

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) .......... 21, 23

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 19, 20, 21

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .......... 18, 19, 29, 34, 37

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .......... 18, 34, 37

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .......... 32

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023) .......... 28, 30, 32

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
710 F.3d 579 (5th Cir. 2013) .......... 27, 38

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) .......... 25

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*
476 F.3d 326 (5th Cir. 2007) .......... 53, 55

*Express Scripts, Inc. v. Richmond*,
No. 4:25-CV-00520-BSM, 2025 WL 2111057
(E.D. Ark. July 28, 2025) .......... 30

*FMC Corp. v. Varco Int'l, Inc.*,
677 F.2d 500 (5th Cir. 1982) .......... 32

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
504 U.S. 353 (1992) .......... 21, 25

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024),
*aff'd*, 606 U.S. 461 (2025) .......... 18, 19

*Galette v. N.J. Transit Corp.*,
146 S. Ct. 854 (2026) .......... 30

*Games Workshop Ltd. v. Individuals*,
No. 6:25-CV-00147-ADA, 2025 WL 2946916
(W.D. Tex. July 10, 2025) .......... 41

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006) .......... 26

*Gould v. U.S. Dep't of Agric.*,
No. 2:25-CV-147-Z, 2025 WL 2402083
(N.D. Tex. Aug. 19, 2025) .......... 18

*Healthy Vision Ass'n v. Abbott*,
138 F.4th 385 (5th Cir. 2025) .......... 17

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................................................... 21

*Kassel v. Consol. Freightways Corp. of Del.*,
450 U.S. 662 (1981).................................................... 25

*Lakedreams v. Taylor*,
932 F.2d 1103 (5th Cir. 1991).................................................... 33

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .................................................... 32

*Mahmoud v. Taylor*,
606 U.S. 522 (2025).................................................... 16, 39

*Maine v. Taylor*,
477 U.S. 131 (1986) .................................................... 24

*Mirabelli v. Bonta*,
146 S. Ct. 797 (2026).................................................... 17, 34, 38

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023) .................................................... 12

*National Meat Association v. Harris*,
565 U.S. 452 (2012) .................................................... 45, 46, 52, 53, 54

*New Energy Co. of Ind. v. Limbach*,
486 U.S. 269 (1988) .................................................... 21, 25

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
48 F.4th 306 (5th Cir. 2022) .................................................... 35, 40

*Nw. Selecta, Inc. v. González-Beiró*,
145 F.4th 9 (1st Cir. 2025).................................................... 52

*Or. Waste Sys., Inc. v. Dep't of Env't Quality*,
511 U.S. 93 (1994) .................................................... 24

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023).................................................... 12, 27, 28, 30, 39

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......... 37, 38

*Sambrano v. United Airlines, Inc.*,
No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) .......... 27, 39

*Smith v. U.S. Dep't of Treasury*,
761 F. Supp. 3d 952 (E.D. Tex. 2025) .......... 34

*Space Exploration Technologies Corp. v. NLRB*,
151 F.4th at 778 .......... 16, 17, 18, 19, 34, 36, 38, 40

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) .......... 24, 35, 40

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) .......... 28, 32

*United States v. Lopez*,
514 U.S. 549 (1995) .......... 35

*Upside Foods, Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
171 F.4th 1239 (11th Cir. 2026) .......... 50

*Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*,
152 F.4th 47 (2d Cir. 2025) .......... 36

*Variscite NY One, Inc. v. New York*,
640 F. Supp. 3d 232 (N.D.N.Y. 2022) .......... 36

*W. Lynn Creamery, Inc. v. Healy*,
512 U.S. 186 (1994) .......... 23

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) .......... 28, 31, 32, 33

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
945 F.3d 206 (5th Cir. 2019) .......... 22, 24, 25

*Williams v. Wingrove*,
153 F.4th 455 (5th Cir. 2025) .......... 11, 55, 56

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 16, 18, 19, 27, 39, 40

*Ex parte Young*,
209 U.S. 123 (1908) .......... 1

**Codes, Statutes, and Rules**

21 U.S.C.
§ 453(f) .......... 46, 47
§ 453(p) .......... 48
§ 467e .......... 43, 44, 46, 48, 50, 51

28 U.S.C.
§ 1292 .......... 2
§ 1331 .......... 1
§ 1343 .......... 1
§ 2201 .......... 1

42 U.S.C. § 1983 .......... 1

25 Tex. Admin. Code § 228.1(b) .......... 26

FDA, Food Code 2017, § 3-603.11 .......... 26

Tex. Health & Safety Code
§ 431.002(5-a) .......... 49, 52
§ 431.02105(a) .......... 9, 23, 25, 29, 49, 52
§ 431.054(a), (c)–(d) .......... 9
§ 431.059(a) .......... 9
§ 431.0585(a)–(b) .......... 9
§ 433.057(d) .......... 37

Tex. Pen. Code
§ 12.21 .......... 9
§ 12.35(a)–(b) .......... 9

2025 Tex. Sess. Law Serv. Ch. 968, § 8 .......... 9, 27

Fed. R. App. P. 4(a)(1)(A) .......... 1

Fed. R. Civ. P. 65 .......... 12

**Other Authorities**

The Federalist No. 11 (Alexander Hamilton) .......... 35, 40

Tex. House of Representatives, *Comm. on Pub. Health* (Apr. 7, 2025), https://house.texas.gov/videos/21658 .......... 10

U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf .......... 47, 48, 51

## JURISDICTIONAL STATEMENT

This appeal is from the denial of a motion for preliminary injunction. On September 2, 2025, Plaintiffs Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc. filed a complaint in the United States District Court for the Western District of Texas under the Supremacy Clause and Commerce Clause of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Declaratory Judgment Act, 28 U.S.C. § 2201; *Ex parte Young*, 209 U.S. 123 (1908); and the district court's inherent equitable power to enjoin state actors from performing unconstitutional acts. ROA.13. Wildtype and UPSIDE filed suit because a new Texas law (SB 261)—which bans the sale of cultivated meat—violates the Commerce Clause, is expressly preempted by federal law and therefore violates the Supremacy Clause, and is causing both companies irreparable harm. ROA.10–65. The district court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On January 30, 2026, the district court denied Wildtype and UPSIDE's motion for preliminary injunction, granted the State Defendants' motion to dismiss the Supremacy Clause claims, and denied the State Defendants' motion to dismiss the Commerce Clause claims. ROA.565–75. On February 26, 2026, Wildtype and UPSIDE filed a timely notice of appeal. ROA.616–18; Fed. R. App. P. 4(a)(1)(A).

Because the appeal is from an order denying a motion for preliminary injunction, this Court has jurisdiction under 28 U.S.C. § 1292.

## STATEMENT OF ISSUES

1. Did the district court err by denying the motion for preliminary injunction without first considering whether there is a likelihood of success on the merits of the Plaintiffs' Commerce Clause claim?

2. Did the district court err by concluding there is no irreparable harm and that the balance of equities does not weigh in favor of relief, even though the Plaintiffs provided evidence of a constitutional violation and unrecoverable injuries?

3. Did the district court err by concluding there is no likelihood of success on the merits of the Supremacy Clause claims, even though the federal Poultry Products Inspection Act expressly preempts states from enacting any additional requirements regarding the ingredients in poultry products or the premises, facilities, or operations of the official establishments in which they are made?

## INTRODUCTION

This case is a constitutional challenge to Texas's recently enacted SB 261, which bans the sale of a safe and federally regulated food product: cultivated meat. Cultivated meat is real meat, but it is produced differently from conventional meat. While conventional meat is directly produced from slaughtered animals, cultivated meat is grown from animal cells. So cultivated meat allows consumers to enjoy the taste of meat without the ethical or health concerns some consumers have with large-scale animal agriculture.

Wildtype and UPSIDE are startups in California that produce cultivated meat. Both startups received the green light from the federal government to distribute and sell cultivated meat nationwide after years of regulatory hurdles. So Wildtype and UPSIDE started selling cultivated meat, including in Texas.

Texas responded by enacting SB 261, a law that bans the sale of cultivated meat for human consumption. Texas legislators and officials repeatedly stated that the purpose of SB 261 was to protect Texas agriculture from competition. Consistent with that purpose, SB 261 bans only the sale—but not the distribution or consumption—of cultivated meat. And no Texas legislator or official cited any evidence that cultivated meat poses a health or safety risk. In essence, Texas closed its border to an entirely out-of-state industry to protect a special interest from lawful competition.

That is unconstitutional under the Commerce Clause of the U.S. Constitution. Texas's law is also expressly preempted by the federal Poultry Products Inspection Act (PPIA), which prohibits states from imposing requirements regarding the permissible ingredients in poultry products or the processes by which they are made in federally regulated facilities.

SB 261 cut off Wildtype and UPSIDE's access to a critical market. As a result, they are suffering ongoing irreparable harm, including unrecoverable economic injuries. To obtain relief from any further irreparable harm, Wildtype and UPSIDE sued and moved for a preliminary injunction.

In a single order, the district court denied Wildtype and UPSIDE's request for preliminary relief, dismissed the Supremacy Clause claims, and denied a motion to dismiss the Commerce Clause claim. Although the Commerce Clause claim survived a motion to dismiss, the district court declined to analyze the likelihood of success of that same claim. Instead, the district court concluded there was no irreparable harm and the equities did not favor preliminary injunctive relief.

This Court should reverse and remand. First, the district court applied the wrong legal standard by declining to consider whether there is a likelihood of success on the Commerce Clause claim. In a constitutional case, the equities are inextricably bound up in the merits, such that a likelihood of success on the merits normally

means there is irreparable harm and that the equities favor relief. Second, even under the standard applied by the district court, it was reversible error to conclude there is no irreparable harm and that the balance of equities does not favor preliminary relief. Third, the district court erred by denying preliminary relief regarding UPSIDE's Supremacy Clause claims. Texas's law bans the sale of products based on how they are produced within federally regulated facilities. That prohibition strikes at the heart of the express preemption provisions of the federal Poultry Products Inspection Act.

## STATEMENT OF THE CASE

Wildtype and UPSIDE are startups in California that produce and sell cultivated meat—a federally regulated food product.

Wildtype was founded by cardiologist Aryé Elfenbein and former diplomat Justin Kolbeck. ROA.318–19 (¶¶ 3, 5–6). Their goal is to help provide clean and accessible seafood while decreasing environmental costs. *See* ROA.319 (¶ 7). To that end, Wildtype produces cultivated salmon in its production facility in San Francisco, California. ROA.318–20 (¶¶ 3, 7, 9, 13–14).

UPSIDE was founded by cardiologist Uma Valeti. ROA.357–58 (¶¶ 3–4). After an experience at a slaughterhouse, Dr. Valeti was inspired to provide an alternative to conventional meat to address ethical, environmental, and health-related concerns. ROA.358–59 (¶¶ 5–10). That inspiration culminated in UPSIDE, which

produces cultivated chicken in its production facility in Emeryville, California. ROA.358–59 (¶¶ 9, 11, 15–16).

Cultivated meat is produced by extracting cells from animals and then growing those cells in controlled facilities. ROA.320 (¶ 15), 359 (¶ 17). There, the extracted cells receive oxygen and nutrients that allow the cells to multiply. ROA.320 (¶ 15), 359 (¶ 17). Using this process, Wildtype and UPSIDE produce food that replicates the taste, texture, and appearance of conventional meat. ROA.320 (¶ 15), 359 (¶ 17). Cultivated meat offers a number of health, environmental, and ethical benefits that appeal to some consumers. ROA.320–22 (¶¶ 17–27), 360–61 (¶¶ 18–28).

The federal government gave Wildtype and UPSIDE the green light to sell their cultivated meat throughout the United States. In May 2025 and November 2022, respectively, Wildtype and UPSIDE completed a pre-market consultation process with the U.S. Food and Drug Administration. ROA.323 (¶ 32), 362 (¶ 33). As part of this process, Wildtype and UPSIDE submitted safety assessments for their cultivated meat and production processes. ROA.323 (¶ 32), 362 (¶ 33). The FDA then issued a "no questions" letter and a scientific memorandum to both companies. ROA.323–24 (¶¶ 33–34), 329–55, 362 (¶¶ 34–35), 368–94. The letters state that the FDA has "no questions" regarding the conclusion that Wildtype and UPSIDE's cultivated meat are "as safe as comparable foods produced by other methods."

ROA.330–31, 369. Separately, UPSIDE received regulatory approval from the U.S. Department of Agriculture in June 2023—a federal requirement because UPSIDE sells a poultry product. *See* ROA.363 (¶¶ 37–38).

After completing years of regulatory work, Wildtype and UPSIDE began selling and distributing cultivated meat in Texas and other states. ROA.324–25 (¶¶ 36–40), 363 (¶¶ 39–41). In July 2025, OTOKO—a sushi restaurant in Austin, Texas—added Wildtype's cultivated salmon to its menu. ROA.324 (¶¶ 37–39). In March 2024, UPSIDE distributed its cultivated chicken in Austin, Texas, and sold its cultivated chicken to a resident of West Lake Hills, Texas. ROA.363 (¶¶ 40–41).

Since receiving regulatory approval, Wildtype and UPSIDE have been subject to routine federal oversight, including inspections and audits. *See* ROA.324 (¶ 35), 363 (¶¶ 36, 38). Wildtype and UPSIDE have not received a single recall of their cultivated meat products and have not received a single health-related complaint from those who have tried them. ROA.328 (¶¶ 59–60), 366 (¶¶ 61–62).

Wildtype and UPSIDE worked to expand business in Texas. Wildtype took six sales trips to Austin—including as recently as July 2025—to speak with potential customers. ROA.325 (¶¶ 41–43). Similarly, UPSIDE spoke with chefs and supermarket chains in Texas regarding their interest in selling UPSIDE's cultivated poultry. ROA.363 (¶¶ 42–44).

Texas ended those efforts by closing its border to an entirely out-of-state industry. Signed into law on June 20, 2025, SB 261 banned the sale of cultivated meat for human consumption for two years. *See* Tex. Health & Safety Code § 431.02105(a). Any person who offers to exchange cultivated meat for money risks penalties up to $25,000 a day and jail time. *See id.* § 431.054(a), (c)–(d); *id.* § 431.0585(a)–(b); *id.* § 431.059(a); Tex. Pen. Code §§ 12.21, 12.35(a)–(b). The sales ban went into effect on September 1, 2025. *See* 2025 Tex. Sess. Law Serv. Ch. 968, § 8 (S.B. 261) (Vernon's). So in Texas, Wildtype and UPSIDE recently lost their customer base, revenue streams, and prospective business opportunities. *See* ROA.325–27 (¶¶ 45–54), 364–65 (¶¶ 46–56).

Because of these irreparable harms, Wildtype and UPSIDE sued and moved for a preliminary injunction. ROA.10, 277. The motion for preliminary injunction requests relief for the two sets of constitutional claims.

First, SB 261 violates the Commerce Clause of the U.S. Constitution because it was enacted with the purpose, and has the effect, of discriminating against interstate commerce. *See* ROA.291–94, 297–303; *see also* ROA.441 (conceding "the legislative record contains statements expressing that the purpose of SB 261 was, in part, to protect the Texas agricultural industry"). Second, with respect to UPSIDE, SB 261 violates the Supremacy Clause of the U.S. Constitution because it is expressly

preempted by the federal Poultry Products Inspection Act. *See* ROA.303–10. Both plaintiffs sought a preliminary injunction on the Commerce Clause claim, and UPSIDE also sought a preliminary injunction on the Supremacy Clause claims. Wildtype and UPSIDE asked the district court to preliminarily enjoin SB 261 to allow Wildtype and UPSIDE to continue selling and offering to sell their cultivated meat products in Texas while the case proceeded. *See* ROA.285, 312–13.

In support, Wildtype and UPSIDE submitted evidence of irreparable harm, including declarations detailing their loss of revenue and business opportunities that are unrecoverable. *See* ROA.310–11, 318–28, 357–67. Wildtype and UPSIDE also cited statements from Texas legislators and officials, as well as from the only interest group that testified in favor of SB 261, stating that the purpose of SB 261 is to protect the Texas agriculture industry from competition. *See* ROA.291–94. Not a single Texas legislator or official identified a scientific study regarding the health or safety of cultivated meat. To the contrary, the only witness from the Department of State Health Services testified that she did not "have any information" about whether cultivated meat is a "public health risk." Tex. House of Representatives, *Comm. on Pub. Health*, at 4:22:10–53 (Apr. 7, 2025), https://house.texas.gov/videos/21658.

In opposition to the motion for a preliminary injunction, the State Defendants did not attach evidence. Instead, the State Defendants mainly argued that Wildtype

and UPSIDE did not establish a likelihood of success on the merits, that Wildtype and UPSIDE's harm is speculative and self-inflicted, and that any loss of revenue is insignificant compared to Texas's harm. *See* ROA.425–59. Separately, the State Defendants moved to dismiss all claims. ROA.397–419.

On January 30, 2026, the district court entered a written order denying Wildtype and UPSIDE's motion for preliminary injunction, denying the motion to dismiss the Commerce Clause claim, and granting the motion to dismiss the Supremacy Clause claims. ROA.575.

As for the Commerce Clause claim, the district court declined to reach the likelihood of success on the merits because it concluded Wildtype and UPSIDE did not "show irreparable harm or that the balance of equities weigh in favor of" injunctive relief. ROA.574. The district court offered two reasons for concluding there is no irreparable harm: (1) SB 261 sunsets in two years, and (2) the "lack of contractual business already in place for Texas." ROA.574. The district court also concluded it "would not comport with the balance of equities" to enjoin SB 261 "for the sake of allowing two companies who were only newly beginning to transact business in Texas." ROA.574–75.

Regarding UPSIDE's Supremacy Clause claims, the district court concluded that the PPIA "does not preempt SB 261." ROA.571. Relying on *Williams v.*

*Wingrove*, 153 F.4th 455 (5th Cir. 2025), the district court limited the PPIA's express preemption clause to food safety and adulteration. *See* ROA.573. The district court reasoned that SB 261 "does not fall under the PPIA's express preemption clause" because it is a sales ban that does not alter food safety and is not about adulteration. ROA.573. The district court then dismissed the Supremacy Clause claims. ROA.573.

On February 26, 2026, Wildtype and UPSIDE filed a timely notice of appeal of the district court's order denying their motion for preliminary injunction. ROA.616.

## STANDARD OF REVIEW

Wildtype and UPSIDE moved for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, and the district court denied the motion. ROA.277, 565. A district court's denial of a motion for preliminary injunction is reviewed for abuse of discretion. *See Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). Conclusions of law, however, are reviewed de novo. *See id.* So while "the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed *de novo*." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (citation omitted).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's denial of Wildtype and UPSIDE's motion for preliminary injunction and remand for further proceedings.

First, the district court applied the wrong legal standard by not first considering whether there is a likelihood of success on the merits of the Commerce Clause claim. In a constitutional case, irreparable harm and the equities are inextricably bound up with the merits. Unsurprisingly, by declining to analyze whether Plaintiffs are likely to succeed on the merits of their federal constitutional claim, the district court gave short shrift to the other preliminary injunction factors. Under Supreme Court and Fifth Circuit precedent, a plaintiff who has shown a likelihood of success on the merits can typically show irreparable harm and that the equities favor preliminary relief. Thus, as the Ninth Circuit has correctly recognized, a district court commits reversible error when it does not analyze likelihood of success after a plaintiff moves for a preliminary injunction on a constitutional claim. That rule ensures that district courts evaluating motions for preliminary injunction take full account of the consequences of laws that burden constitutional rights.

Second, the evidence presented by Wildtype and UPSIDE showed that both companies *are* experiencing irreparable harm, and the district court erred by concluding otherwise. Under SB 261, Wildtype and UPSIDE are suffering not only

constitutional injuries, but also economic injuries that are unrecoverable because of sovereign immunity. These constitute irreparable harms under this Court's precedent. The district court's contrary conclusion—that Wildtype and UPSIDE are not suffering irreparable harm now because SB 261 will sunset in two years—has no basis in equity jurisprudence. As a result, the district court's ruling regarding irreparable harm independently warrants reversal. The same goes for the district court's conclusion on the balance of equities. The equities favor preliminary relief in part because the public interest favors the free flow of interstate commerce. Texas, by contrast, faces no cognizable injury.

Finally, the federal Poultry Products Inspection Act expressly preempts any state law that adds requirements to the permissible ingredients of poultry products or the premises, facilities, or operations of the official establishments in which they are produced. In other words, federal law sets the ceiling—a uniform, national standard—and state law cannot raise it. But here, SB 261 bans what the federal government allows. The federal government said UPSIDE can cultivate chicken cells and sell the resulting products. Yet SB 261 says UPSIDE cannot. Because SB 261 does what the PPIA expressly forbids, it violates the Supremacy Clause. And although Texas tries to avoid this result by emphasizing that SB 261 is a sales ban, that argument fails because the Supreme Court has expressly rejected the argument that a

state can evade federal preemption by prohibiting the sale of meat products made in a manner the state does not like.

## ARGUMENT

This Court should reverse the district court's denial of Wildtype and UPSIDE's motion for preliminary injunction and remand for further proceedings. To explain why, this brief proceeds in two parts. In Part I, Wildtype and UPSIDE explain why the district court erred by denying their request for preliminary relief regarding their Commerce Clause claim. That is because (A) the district court applied the wrong legal standard by not first considering whether there is a likelihood of success on the merits; (B) the district court ignored that Wildtype and UPSIDE are experiencing irreparable harm, including unrecoverable economic injuries and a constitutional injury; and (C) the balance of equities weighs in favor of relief. In Part II, UPSIDE explains why the district court erred by denying the request for preliminary relief regarding its Supremacy Clause claims based on a misreading of federal law.

### I. The district court erred by denying Wildtype and UPSIDE's motion for a preliminary injunction on their Commerce Clause claim.

The district court denied Wildtype and UPSIDE's motion for preliminary injunction on their Commerce Clause claim. This Court should reverse for three independent reasons. First, the district court applied the incorrect legal standard by not analyzing Plaintiffs' likelihood of success on this constitutional claim. Second, the

record shows Wildtype and UPSIDE are suffering a variety of irreparable harms. Third, the balance of equities weighs in their favor.

### A. The district court applied the wrong legal standard.

The district court denied the State Defendants' motion to dismiss Wildtype and UPSIDE's constitutional claim. But in the same opinion, the district court declined to consider whether Wildtype and UPSIDE are likely to succeed on their constitutional claim. The district court instead concluded that there is no irreparable harm and that the balance of equities does not weigh in favor of relief. As explained below, because the district court did not analyze the likelihood of success of Plaintiffs' federal constitutional claim, the district court applied the incorrect legal standard. And that error was not harmless, as Plaintiffs have shown that they are likely to succeed on the merits of their claim under the Commerce Clause.

#### 1. *When a plaintiff moves for a preliminary injunction on a constitutional claim, the district court must analyze likelihood of success.*

To obtain a preliminary injunction, a plaintiff must show: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) (same). "The first factor—likelihood of success on the merits—is the most important." *Space Expl. Techs.*

*Corp. v. NLRB*, 151 F.4th 761, 772 (5th Cir. 2025) (cleaned up). The third and fourth factors merge where, as here, the government is the non-movant. *Id.* at 780; *accord Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 408 (5th Cir. 2025) (public officers).

Even though likelihood of success is the most important factor, the district court declined to consider whether Wildtype and UPSIDE are likely to succeed on their constitutional claim. That alone warrants reversal.

When a plaintiff asserts a constitutional claim and moves for a preliminary injunction, a district court must analyze whether the plaintiff is likely to succeed on the merits of that claim. The reason is straightforward: In a federal constitutional case, the equities are intertwined with the merits. A plaintiff that shows likelihood of success on a constitutional claim is entitled to a relaxed standard for the remaining preliminary injunction factors. Applying that standard, in turn, typically results in injunctive relief. As a result, a district court that does not consider whether there is a likelihood of success of a constitutional claim deprives plaintiffs of the standard to which they are entitled.

To understand why district courts must analyze likelihood of success when a plaintiff seeks a preliminary injunction for a constitutional claim, start with irreparable harm. The Supreme Court recently reminded us that the denial of "constitutional rights" is irreparable harm. *See Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026)

(per curiam) (substantive due process and free exercise). In that vein, "most courts hold that no further showing of irreparable injury is necessary" when a plaintiff alleges the "deprivation of a constitutional right." *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) (citation omitted). As this Court put it, "the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (cleaned up). So a likelihood of success on the merits of a constitutional claim ordinarily results in a finding of irreparable harm. *See, e.g.*, *Gould v. U.S. Dep't of Agric.*, No. 2:25-CV-147-Z, 2025 WL 2402083, at *7 (N.D. Tex. Aug. 19, 2025) (Kacsmaryk, J.) (due process).

Similarly, a plaintiff who is likely to succeed on the merits of a constitutional claim ordinarily shows the balance of equities and public interest weigh in favor of injunctive relief. Other than likelihood of success and irreparable harm, the remaining preliminary injunction factors are the balance of equities and public interest. *Winter*, 555 U.S. at 20. Again, the balance of equities and public interest merge where, as here, the government is the non-movant. *Space Expl.*, 151 F.4th at 780.

This Court has recognized that a state normally has an interest in enforcing its laws. *Id.* But this Court has also recognized that "the government suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coal., Inc. v.*

*Paxton*, 95 F.4th 263, 287 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025). Indeed, the public is served when the government follows the U.S. Constitution. *See, e.g.*, *Space Expl.*, 151 F.4th at 780 (separation of powers); *Book People*, 91 F.4th at 341 (First Amendment). Thus, to decide whether the state stands to be harmed by an order enjoining an allegedly unconstitutional law, a district court must first consider the merits of the constitutional claim.

In sum, when a plaintiff asserts a constitutional claim and moves for a preliminary injunction, the merits are intertwined with the equities. So a district court cannot properly evaluate irreparable harm or the balance of equities without first considering the merits of the constitutional claim.

Here, however, the district court effectively circumvented precedent by not reaching the likelihood of success of the constitutional claim—"the most important" preliminary injunction factor. *See Space Expl.*, 151 F.4th at 772 (cleaned up). As the Ninth Circuit recently held, "In a case presenting a constitutional claim, it is *always necessary* for a district court to determine whether a plaintiff is likely to succeed on the merits, because of the influence such a finding has on the other *Winter* factors." *Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023) (VanDyke, J.) (emphasis added). That is because a plaintiff who shows there is a likelihood of success on her constitutional claim can normally show that she is suffering irreparable harm and that

the public interest is in her favor. *See id.* at 1040, 1044. Put differently, likelihood of success on the merits is "usually decisive" when "a plaintiff brings a constitutional claim." *Id.* at 1041. For that reason, the Ninth Circuit concluded that the district court's failure to analyze likelihood of success of the constitutional claim was reversible error. *See id.* at 1044. And that conclusion is consistent with this Court's precedent establishing that the merits of constitutional claims intertwine with the equities and are usually dispositive. *See supra*, at 17–19.

The Ninth Circuit's decision in *Baird*, which involved a Second Amendment challenge, shows how constitutional rights receive less protection when district courts do not analyze the likelihood of success on the merits. Without the *Baird* rule, district courts in this circuit can sidestep the protections guaranteed by our Constitution by declining to consider the merits of a federal constitutional claim. That not only dilutes the Second Amendment, as *Baird* illustrates, but also risks diluting other constitutional rights like free speech and the free exercise of religion. Rather than endorse unfettered discretion to selectively choose which federal constitutional rights are worth analyzing in the preliminary injunction context, this Court should adopt Judge VanDyke's opinion in *Baird*.

In sum, the district court applied the wrong legal standard when it declined to analyze whether Wildtype and UPSIDE's constitutional claim is likely to succeed on

the merits. *Baird*, 81 F.4th at 1044. This Court should adopt the Ninth Circuit's holding in *Baird*, reverse the district court's denial of the motion for preliminary injunction, and remand with instructions to consider likelihood of success on the merits of the Commerce Clause claim.

#### 2. *The district court's failure to analyze likelihood of success was not harmless.*

The district court's decision not to analyze the likelihood of success of the Commerce Clause claim was not harmless. Had the court reached likelihood of success, the record would have shown that SB 261 is subject to heightened scrutiny and cannot survive it.

The Dormant Commerce Clause prohibits economic protectionism. *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). "A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (citation omitted). A law therefore does not escape heightened scrutiny simply because it is written in formally evenhanded terms. *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992). Courts must look to whether the law operates by design or effect to shield an in-state commercial interest from interstate competition. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–53 (1977); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71 (1984).

SB 261's protectionist purpose is not subtle. The lead House sponsor said the "goal" of SB 261 was "to protect our agriculture industry." ROA.291–94. Many other legislative statements likewise tied the bill to protecting Texas cattle raisers, meat producers, ranchers, and traditional agriculture. ROA.291–94. The State itself conceded that "the legislative record contains statements expressing that the purpose of SB 261 was, in part, to protect the Texas agricultural industry." ROA.441. That is enough to trigger heightened scrutiny. A discriminatory purpose need not be the State's only purpose; it is enough that it was a substantial or motivating factor. *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019).

SB 261 also has a discriminatory effect. Wildtype and UPSIDE produce cultivated meat in California, not Texas. ROA.318–20 (¶¶ 3, 7, 9, 13–14), 358–59 (¶¶ 9, 11, 15–16). The record shows that all companies in the United States approved to sell cultivated meat are based outside Texas. ROA.328 (¶ 63), 367 (¶ 66). And cultivated meat competes with conventional meat. Wildtype's cultivated salmon serves as a substitute for and competes with conventional meat, including conventional salmon. ROA.322 (¶¶ 28–29). UPSIDE's cultivated meat likewise serves as a substitute for and competes with conventional meat. ROA.361–62 (¶¶ 29–30).

Texas might argue that, because cultivated meat is not identical to conventional meat, SB 261 can escape heightened scrutiny under the Dormant Commerce Clause. But the Dormant Commerce Clause does not require identical products. In *Bacchus*, the Supreme Court held that Hawaii's tax exemption discriminated against interstate commerce even though the favored local product represented less than one percent of annual liquor sales, because "as long as there is some competition" between local and out-of-state products, there is discriminatory effect. 468 U.S. at 268–69, 271. The same principle applies here. Cultivated meat and conventional meat compete in the market for meat, and SB 261 eliminates the out-of-state substitute while leaving the in-state conventional industry untouched.

Nor can Texas minimize the burden as "de minimis." SB 261 does not impose a small compliance cost or marginal disadvantage. It prohibits Wildtype and UPSIDE from selling or offering to sell their products anywhere in Texas. ROA.325 (¶¶ 45–47), 364 (¶¶ 46–48); Tex. Health & Safety Code § 431.02105(a). A state may not avoid Dormant Commerce Clause scrutiny by banning an out-of-state innovation before it has gained a large market share. That would give incumbent industries precisely the protection from interstate competition that the Commerce Clause forbids. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994).

Once a state law discriminates against interstate commerce by purpose or effect, the burden falls on the State to show both that the law serves a legitimate local purpose and that the purpose cannot be served as well by available nondiscriminatory alternatives. *Maine v. Taylor*, 477 U.S. 131, 138 (1986); *Allstate*, 495 F.3d at 160. That burden is demanding; discriminatory laws are subject to a "virtually *per se* rule of invalidity." *See Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 100 (1994). And when a State invokes health and safety, it must produce concrete evidence that the law actually promotes those interests and that nondiscriminatory alternatives are inadequate. *Wal-Mart Stores*, 945 F.3d at 213; *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 540 (2019).

Texas did not carry that burden. The State Defendants submitted no evidence in opposition to preliminary relief. ROA.425–59. Plaintiffs did. Wildtype and UPSIDE completed FDA premarket consultations, and the FDA issued no-questions letters stating that it had no questions about the companies' conclusions that their products are as safe as comparable foods produced by other methods. ROA.323–24 (¶¶ 33–34), 330–31, 362 (¶¶ 33–35), 369–70. UPSIDE also received USDA-FSIS label approval and a Grant of Inspection for its cultivated chicken. ROA.363 (¶¶ 37–38). Neither company has had a recall or received a health-related complaint. ROA.328 (¶¶ 59–60), 366 (¶¶ 61–62).

The legislative record likewise lacked evidence of a public-health problem. Plaintiffs pointed out that no Texas legislator or official identified a scientific study showing that cultivated meat is unsafe. Further, a neutral witness from the Department of State Health Services testified that she did not "have any information" that cultivated meat was a public-health risk. ROA.291–94. A state cannot satisfy heightened scrutiny through speculation and unsupported assertions. *Wal-Mart Stores*, 945 F.3d at 213; *see Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951) (a law is not constitutional just because the government says it is "a health measure"); *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality) (similar).

The structure of SB 261 confirms the weakness of Texas's asserted safety rationale. The statute prohibits sales and offers for sale, but not possession, consumption, or free distribution. *See* Tex. Health & Safety Code § 431.02105(a). There is no health-and-safety reason why cultivated meat becomes dangerous only when exchanged for money. That under-inclusiveness is evidence that the law's real target is economic competition, not food safety. *See Fort Gratiot*, 504 U.S. at 367; *New Energy*, 486 U.S. at 279; *Kassel*, 450 U.S. at 671 n.12 (plurality).

Texas also had obvious nondiscriminatory alternatives. It could enforce ordinary food-safety laws, require accurate labeling or disclosures, or study the products without excluding them from the Texas market. Plaintiffs pointed out below that

Texas already addresses recognized food risks, such as raw shellfish and undercooked animal products, through disclosure requirements rather than categorical bans. *See, e.g.*, 25 Tex. Admin. Code § 228.1(b); FDA, *Food Code 2017*, § 3-603.11. Texas never showed why similar or narrower alternatives would be inadequate here. Because the State bore that burden at the preliminary-injunction stage, its failure is dispositive. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (reiterating that the burden at the preliminary injunction stage tracks the burden at trial).

In sum, the district court's failure to analyze likelihood of success on the merits of the Commerce Clause claim was not harmless.

**B. Wildtype and UPSIDE are suffering irreparable harm.**

If this Court agrees that the district court applied the wrong preliminary injunction standard, that alone warrants reversal. But even setting aside the standard, the district court erred by concluding Wildtype and UPSIDE are not suffering irreparable harm. First, Wildtype and UPSIDE are suffering irreparable harm in the form of unrecoverable economic injuries. Second, if the district court applies the proper standard discussed above and concludes there is a likelihood of success, it should also conclude that Wildtype and UPSIDE are suffering irreparable harm in the form of a constitutional injury.

To obtain a preliminary injunction, a plaintiff must show that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm is "harm for which there is no adequate remedy at law." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013). This Court has reversed the denial of a preliminary injunction when a district court incorrectly concludes there is no irreparable harm. *See, e.g.*, *Rest. L. Ctr.*, 66 F.4th at 600; *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *10 (5th Cir. Feb. 17, 2022) (per curiam).

To explain their irreparable harm, Wildtype and UPSIDE begin by summarizing their Commerce Clause claim. Wildtype and UPSIDE are members of an entirely out-of-state industry—sellers of cultivated meat. ROA.318–20 (¶¶ 3, 7, 9, 13–14), 328 (¶ 62), 358–59 (¶¶ 9, 11, 15–16), 366 (¶ 65). After completing an extensive, multi-year federal regulatory process, Wildtype and UPSIDE started to sell cultivated meat in Texas. *Supra*, at 7–8. The State of Texas quickly banned the sale of cultivated meat by passing SB 261. *See* 2025 Tex. Sess. Law Serv. Ch. 968, § 8 (Vernon's). Through SB 261, Texas closed its border to an entirely out-of-state industry (cultivated meat) to protect Texas agriculture from competition. SB 261 violates the Commerce Clause because its purpose and effect is to discriminate against interstate commerce. *See* ROA.30–39, 45–48, 291–94, 297–303.

As a result of SB 261, Wildtype and UPSIDE have suffered and are continuing to suffer unrecoverable economic injuries and a constitutional injury. So Wildtype and UPSIDE sued and moved for a preliminary injunction to maintain the status quo—the ability to continue selling and offering to sell cultivated meat in Texas. *See* ROA.285, 312–13. In support, Wildtype and UPSIDE submitted evidence of their ongoing harms, including declarations from the founders of their companies. *See* ROA.325–27 (¶¶ 45–58), 364–66 (¶¶ 46–60). The State Defendants submitted no evidence in opposition.

#### 1. *Wildtype and UPSIDE are suffering irreparable economic injuries.*

Wildtype and UPSIDE are suffering irreparable harm in the form of unrecoverable economic injuries. Accordingly, the district court erred by concluding there is no irreparable harm.

Economic injuries can constitute "irreparable harm where they cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr.*, 66 F.4th at 597 (quoting *Texas v. EPA*, 829 F.3d 405, 434 & n.41 (5th Cir. 2016)) (internal quotation marks omitted). Economic injuries cannot be recovered in the ordinary course of litigation, and are therefore irreparable, when the defendant is entitled to sovereign immunity. *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Further,

economic injuries that flow from unconstitutional state statutes can constitute irreparable harm. *See Book People*, 91 F.4th at 341. Here, Wildtype and UPSIDE have suffered and are continuing to suffer two distinct economic injuries—lost revenue and lost business opportunities.

First consider lost revenue. Before SB 261, Wildtype and UPSIDE sold cultivated meat in Texas and received revenue from those sales. ROA.324 (¶¶ 37–39), 363 (¶ 41). Wildtype was selling cultivated salmon at a sushi restaurant in Austin, Texas, whereas UPSIDE sold cultivated poultry to a Texas resident. ROA.324 (¶¶ 37–39), 363 (¶ 41). But SB 261 forced Wildtype and UPSIDE to stop selling and offering to sell cultivated meat in Texas. ROA.325 (¶¶ 45–47), 364 (¶¶ 46–48); *see* Tex. Health & Safety Code § 431.02105(a). As a result of SB 261, Wildtype and UPSIDE no longer have access to revenue from Texas consumers. ROA.326 (¶ 48), 364 (¶ 49).

Separate from revenue sources in Texas, Wildtype and UPSIDE were developing business opportunities in Texas when SB 261 ended them. Before SB 261 went into effect, Wildtype spoke with potential customers in Texas that were interested in Wildtype's cultivated salmon. ROA.324–25 (¶¶ 37–38, 42). To that end, Wildtype took six sales trips to Austin, Texas, with the goal of partnering with other businesses to sell cultivated salmon in Texas. ROA.325 (¶ 41). Similarly, before SB

261, UPSIDE spoke with chefs and supermarket chains in Texas regarding their interest in selling UPSIDE's cultivated poultry.[1] ROA.363 (¶¶ 42–43). But because SB 261 prevents anyone from selling or offering to sell cultivated meat, Wildtype and UPSIDE had no choice but to stop pursuing those business opportunities. ROA.325–26 (¶¶ 46–47, 49–50), 364 (¶¶ 46–47, 50–51).

Both types of economic injuries—lost revenue and lost business opportunities—are irreparable because they cannot be recovered through litigation. *See Rest. L. Ctr.*, 66 F.4th at 597.

First, the State Defendants—who are sued in their official capacities—have sovereign immunity for damages. *See Galette v. N.J. Transit Corp.*, 146 S. Ct. 854, 870 (2026). Because the State Defendants have sovereign immunity, Wildtype and UPSIDE's lost revenue and lost business opportunities are irreparable harms under this Court's precedent. *See Clarke*, 74 F.4th at 643; *Wages & White Lion*, 16 F.4th at 1142. District courts apply these principles to conclude there is irreparable harm. *See, e.g.*, *Express Scripts, Inc. v. Richmond*, No. 4:25-CV-00520-BSM, 2025 WL 2111057, at *7 (E.D. Ark. July 28, 2025) (Dormant Commerce Clause).

---

[1] Without a protective order in place, Wildtype and UPSIDE did not reveal their potential business partners. UPSIDE, for example, was in active discussions with a large supermarket to have its products carried there. The discussions ended because of the Texas ban.

Second, SB 261 leaves Wildtype and UPSIDE without any business in Texas, which has irreparable effects in what should otherwise be a national common market. As the founders of Wildtype and UPSIDE testified, the loss of their business in Texas and the continued fragmentation of the interstate market decrease their revenue, threaten continued investment in their companies, and make it harder to sell cultivated meat to consumers, chefs, and restaurants. *See* ROA.323 (¶ 30), 326–27 (¶¶ 53–54, 57–58), 365–66 (¶¶ 54–56, 59–60). The law also forces the companies to miss out on one-time opportunities to present or sell their products that cannot be replaced. As a result, SB 261 has made it harder for Wildtype and UPSIDE to achieve economies of scale and lower costs and prices. *See* ROA.327 (¶ 54), 365 (¶ 56). These outcomes place Wildtype and UPSIDE at a competitive disadvantage compared to conventional meat producers. *See* ROA.327 (¶ 54), 365 (¶ 56). None of these economic injuries can be remedied through monetary damages.

To sidestep these conclusions about unrecoverable economic costs, the State Defendants advanced two main arguments before the district court. Both lack merit.

The State Defendants did not contest that Wildtype and UPSIDE suffered lost revenue because of SB 261. Instead, the State Defendants quibbled with how much revenue Wildtype and UPSIDE received in Texas before SB 261 took effect. *See* ROA.456–57 ("Plaintiffs did not lose major revenue streams."). True, Wildtype

and UPSIDE did not reach millions in sales in Texas. But the number of sales can be explained by the short time in between receiving the FDA's green light and SB 261's effective date, as well as the nature of startups that take time to scale.[2]

Even so, the quantity of Wildtype and UPSIDE's sales is beside the point. For irreparable harm, "it is not so much the magnitude but the irreparability that counts." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 238 (5th Cir. 2024) (quoting *Texas v. EPA*, 829 F.3d at 433–34). That Wildtype sold cultivated meat at a restaurant for a few months instead of a few years is a question of magnitude, not irreparability. Indeed, this Court's precedent recognizes there can be irreparable harm even when the injury is as low as "only one percent" of employees leaving their job, *Louisiana v. Biden*, 55 F.4th 1017, 1034–35 (5th Cir. 2022), or even when "a single trade secret" is disclosed, *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir. 1982). Similarly, what matters here is not the quantity of Wildtype and UPSIDE's lost revenue. Instead, what matters is that Wildtype and UPSIDE's lost revenue cannot be recovered because of sovereign immunity. *See Clarke*, 74 F.4th at 643; *Wages & White Lion*, 16 F.4th at 1142. So under this Court's precedent

[2] For Wildtype, there were about three months between the FDA's green light and SB 261's effective date. *See* ROA.323 (¶ 32).

in *Clarke* and *Wages & White Lion*, Wildtype and UPSIDE's lost revenue constitutes irreparable harm.

The State Defendants' second argument fares no better. The State Defendants argued before the district court that Wildtype and UPSIDE's "lost business opportunities are speculative." ROA.457. That is wrong. Wildtype and UPSIDE provided evidence about their past and prospective business opportunities in Texas in a manner that did not jeopardize future business negotiations. *See supra*, at 8, 29–30 & n.1. What is more, that evidence adheres to precedent.

A plaintiff can show irreparable harm if "the nature of [the economic] rights makes establishment of the dollar value of the loss especially difficult or speculative." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (cleaned up). For example, monetary damages may be difficult to calculate because there is a "lack of a sales history" and because the nature of the damage is to the plaintiff's "reputation." *See Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991). Yet despite the difficulty in calculating damages, those economic harms can still be irreparable. *See id.* So too here. Wildtype and UPSIDE produce an innovative product in a large market and should be ramping up business in Texas. But SB 261 said they cannot. Wildtype and UPSIDE's lost business opportunities are irreparable.

In sum, Wildtype and UPSIDE are suffering irreparable harms in the form of unrecoverable economic injuries: lost revenue and lost business opportunities. Those irreparable harms are an independent basis for reversing the district court.

#### 2. *Wildtype and UPSIDE are also suffering an irreparable constitutional injury.*

The district court also erred by concluding Wildtype and UPSIDE are not suffering irreparable harm because there is a constitutional injury. Had the district court analyzed the likelihood of success of the underlying constitutional claim, the district court would have reached the conclusion that Wildtype and UPSIDE are suffering irreparable harm in the form of a constitutional injury. So the district court also erred by concluding Wildtype and UPSIDE are not suffering irreparable harm.

Recall that the denial of constitutional rights constitutes irreparable harm. *See supra*, at 17–18 (citing *Mirabelli*, 146 S. Ct. at 803; *Book People*, 91 F.4th at 340–41; *BST Holdings*, 17 F.4th at 618). Put another way, "[c]ompelling individuals to comply with a law that is unconstitutional is irreparable harm." *Smith v. U.S. Dep't of Treasury*, 761 F. Supp. 3d 952, 972 (E.D. Tex. 2025) (Kernodle, J.) (collecting cases). A constitutional injury under the Commerce Clause is no different.

In *Space Exploration Technologies Corp. v. NLRB*, the NLRB argued there was no irreparable harm because there is "a line between structural constitutional claims and those involving individual rights, such as the First Amendment or privacy." 151

F.4th at 778. This Court disagreed. *Id.* The NLRB's "line is illusory" because "structural principles secured by the separation of powers protect the individual as well." *Id.* (citation omitted). The same is true here. The Commerce Clause provides a structural protection in our system of federalism. *See United States v. Lopez*, 514 U.S. 549, 552–53 (1995). Indeed, a major reason for adopting the U.S. Constitution was to ensure a national common market and prevent the Balkanization of states. *See Tenn. Wine & Spirits*, 588 U.S. at 515–17; *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 317–18 (5th Cir. 2022); The Federalist No. 11 (Alexander Hamilton). In these ways, a state that closes its border to an out-of-state industry inflicts irreparable harm by denying access to the national common market. That injury is not merely theoretical; Wildtype and UPSIDE have been shut out of Texas at the expense of competition, innovation, and consumer choice. *See* ROA.325–27 (¶¶ 45–54), 364–65 (¶¶ 46–56).

Other circuits recognize that the normal rule for constitutional injuries is no different for constitutional injuries under the Dormant Commerce Clause. In a Dormant Commerce Clause case, the Eighth Circuit recently applied the principle that it is "always in the public interest to protect constitutional rights." *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025). In doing so, the Eighth Circuit rejected the government's proposed distinction between a constitutional

injury under the Dormant Commerce Clause and a constitutional injury under the First Amendment. *See id.* at 961 n.2. Similarly, in a Dormant Commerce Clause case, the Second Circuit recited the standard for irreparable harm: "When, as here, a plaintiff alleges constitutional injury, 'a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm.'" *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, 152 F.4th 47, 60 (2d Cir. 2025) (citation omitted); *see Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, 243–44 (N.D.N.Y. 2022) (granting a preliminary injunction after concluding the constitutional injury under the Dormant Commerce Clause is irreparable).

This Court's precedent on irreparable harm, its reasoning in *Space Exploration*, and the other circuits who have analyzed the Dormant Commerce Clause all point to a single conclusion: Wildtype and UPSIDE are suffering irreparable harm in the form of an ongoing constitutional injury. The district court, however, did not analyze the merits of the underlying constitutional claim. That decision, in turn, led to the district court's erroneous conclusion that Wildtype and UPSIDE are not suffering irreparable harm. This Court should reverse.

### 3. *The district court offered no valid basis to reject irreparable harm.*

The district court offered two reasons for concluding Wildtype and UPSIDE are not suffering irreparable harm: SB 261 will sunset in two years, and the "lack of contractual business already in place for Texas." ROA.574. But there is no sunset exception to irreparable harm, and the district court is mistaken about the record.

For now, SB 261 is set to expire in September 2027. Tex. Health & Safety Code § 433.057(d). But for at least the next year and a half, SB 261 will continue to harm Wildtype and UPSIDE. *See supra*, at 9, 28–36. That SB 261 is currently slated to expire on a specific day in the future is not a legal basis for concluding there is no irreparable harm right now.

The district court's novel exception for laws that are scheduled to end is irreconcilable with this Court's precedent that "the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *BST Holdings*, 17 F.4th at 618 (cleaned up); *see Book People*, 91 F.4th at 340–41. Indeed, substituting a constitutional injury under the Commerce Clause with a constitutional injury under the First Amendment reveals the district court's reasoning is untenable. For example, a law that bans speech inflicts irreparable harm even if the law is only in effect for a minimal period of time. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). That principle applies to other constitutional injuries. *See, e.g.*, *Mirabelli*, 146 S. Ct. at 803 (substantive due process and free exercise); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191–92 (2023) (being forced to participate in an unconstitutional proceeding is a "'here-and-now' injury" that "is impossible to remedy once the proceeding is over"); *Space Expl.*, 151 F.4th at 778–79 (rejecting a "line" between the First Amendment and other constitutional claims for irreparable harm).

More broadly, focusing on whether a law is scheduled to end is inconsistent with the nature of the irreparable-harm inquiry. Irreparable harm asks whether there is no adequate remedy at law. *Daniels Health*, 710 F.3d at 585. It does not ask whether the law or challenged policy will end soon. By way of example, the Supreme Court has enjoined an executive order as violating the First Amendment over the dissent's argument that the Court "should withhold relief because the relevant circumstances have now changed." *Roman Catholic Diocese*, 592 U.S. at 20. As the Supreme Court noted in response to the dissent, the governor who issued the challenged order "regularly changes the classification of particular areas without prior notice." *Id.* So if the governor once again reclassifies, "there may not be time for applicants to seek and obtain relief" from the Supreme Court before the constitutional injury happens again. *Id.* In other words, that a challenged policy could change or end soon is not a

basis for denying injunctive relief for a constitutional claim. The same is true here. Simply put, there is no sunset exception to irreparable harm.

Separately, the district court misunderstood the record, reaching conclusions that were plainly erroneous. Contrary to what the district court stated, Wildtype was selling cultivated salmon at OTOKO in Austin when SB 261 took effect, and both companies were developing additional business in Texas. *See* ROA.324–25 (¶¶ 37–39, 41–43), 363 (¶¶ 40–44). SB 261 ended those ongoing and prospective business opportunities.

The district court offered no legal basis for concluding that Wildtype and UPSIDE are not suffering irreparable harm.

* * *

Under Supreme Court precedent, Wildtype and UPSIDE must show they are "likely" to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20; *Mahmoud*, 606 U.S. at 546. Here, Wildtype and UPSIDE have shown more: Their constitutional injury is ongoing, and their economic injuries are unrecoverable. The district court erred by concluding Wildtype and UPSIDE are not suffering irreparable harm, so this Court should reverse. *See Rest. L. Ctr.*, 66 F.4th at 600; *Sambrano*, 2022 WL 486610, at *10.

### C. <u>The equities favor preliminary relief.</u>

Separate from the legal standard and irreparable harm, the district court also erred by concluding that the balance of equities does not favor preliminary relief.

To obtain a preliminary injunction, a plaintiff must also show that "the balance of equities tips in his favor" and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two preliminary injunction factors merge where, as here, the government is the non-movant. *Space Expl.*, 151 F.4th at 780.

Wildtype and UPSIDE make the requisite showing for three reasons. First, an injunction is in the public interest because SB 261 is unconstitutional. As Wildtype and UPSIDE explained, the equities are intertwined with the merits. In particular, the public is served when the government follows the Constitution. *See supra*, at 18–19, 35–36. Because the district court failed to first consider the likelihood of success, the district court erred by not applying the relaxed preliminary injunction standard for meritorious constitutional claims. *See supra*, at 16–21.

Second, an injunction is also in the public interest because the public has a strong interest in the free flow of goods in the national marketplace. A major reason for adopting the Constitution was to ensure a national common market. *Supra*, at 35 (citing *Tenn. Wine & Spirits*, 588 U.S. at 515–17; *NextEra Energy*, 48 F.4th at 317–18; The Federalist No. 11 (Alexander Hamilton)); U.S. Const. art. I, § 8. Consumers

benefit when they are allowed to decide for themselves what goods to buy in the interstate market, and they are harmed when states unconstitutionally take that choice away from them. These realities help explain why the Eighth Circuit recently concluded in a Dormant Commerce Clause case that the public interest favors the protection of constitutional rights. *See Ass'n for Accessible Meds.*, 140 F.4th at 961. Similar to a national common market, the public interest favors "the invention and development of innovative products," *Games Workshop Ltd. v. Individuals*, No. 6:25-CV-00147-ADA, 2025 WL 2946916, at *4 (W.D. Tex. July 10, 2025) (Albright, J.), as illustrated by the Constitution's recognition of the importance of patents and science. *See* U.S. Const. art. I, § 8, cl. 8. Cultivated meat is an innovative food, but SB 261 prevents it from competing in the national marketplace.

Third, without an injunction, the inability to sell cultivated meat in Texas has negative downstream effects. For Wildtype and UPSIDE, those negative effects include the loss of business, decreased revenue, diminished investor confidence, increased difficulty in selling cultivated meat, and challenges in achieving economies of scale. *See supra*, at 29–31. More broadly, the negative downstream effects include less price-competitive food and less competition. *See* ROA.322 (¶ 28), 327 (¶ 54), 361–62 (¶ 31), 365 (¶ 56).

By contrast, an injunction will not require the State of Texas to expend any resources or obligate any funds. An injunction will simply restore the status quo as it existed before SB 261 took effect on September 1, 2025: Wildtype and UPSIDE can sell and offer to sell cultivated meat in Texas. And Texas has not identified, and cannot identify, injuries that counterbalance the real harms facing Wildtype and UPSIDE.

The district court, nonetheless, concluded "that enjoining the law from having any effect in Texas, for the sake of allowing two companies who were only newly beginning to transact business in Texas, would not comport with the balance of equities required for preliminary injunctive relief."[3] ROA.574–75. That Wildtype and UPSIDE "were only newly beginning to transact business in Texas" offers no principled basis for concluding the equities disfavor relief. Wildtype and UPSIDE are not too small for the Constitution to apply. If this Court reverses and remands for the district court to analyze likelihood of success, the district court's ensuing analysis of the equities must comport with this Court's precedent on the public interest when the Constitution is violated. *See supra*, at 18–19.

[3] If the district court understood Wildtype and UPSIDE to seek only facial relief, that was incorrect. They seek both facial and as-applied relief. *See* ROA.13.

The district court applied the wrong legal standard, which led to the incorrect conclusion that the balance of equities does not weigh in favor of relief. Even so, the balance of equities weighs in favor of relief because of the public's interest in the free flow of goods, the interest in participating in the interstate market, and the lack of any cost to the State of Texas. This Court should reverse and remand.

## II. The district court erred by denying UPSIDE's motion for preliminary injunction regarding its Supremacy Clause claims.

Separate from Wildtype and UPSIDE's claims under the Commerce Clause, the district court erred by denying preliminary relief regarding UPSIDE's claims under the Supremacy Clause. The district court based this ruling on its conclusion that UPSIDE was unlikely to succeed on the merits of its preemption arguments.

That was error. UPSIDE is likely to succeed. The PPIA's preemption provision—21 U.S.C. § 467e—expressly preempts state requirements that differ from or exceed federal requirements for articles prepared at official establishments, including ingredient requirements and requirements with respect to the premises, facilities, and operations of official establishments. SB 261 is such a requirement. It does not merely decide that Texas will not allow some animal species to be eaten. It bars an otherwise lawful chicken product because it contains a specific ingredient (cultivated chicken cells) produced in a federally regulated facility through processes the federal government specifically permits (cell cultivation).

Even so, the district court concluded that, because the law was structured as "a complete sales ban," it "d[id] not fall under the PPIA's express preemption clause." ROA.573. That was error. As explained below, the federal PPIA broadly preempts state requirements regarding the permissible ingredients in poultry products or the processes by which they are manufactured, even if those requirements take the form of a sales ban. Those preemption provisions apply here because UPSIDE's product is a "poultry product" within the meaning of the PPIA. As a result, a state cannot ban its sale based solely on the presence of federally permissible ingredients or the manner in which it is manufactured in USDA-regulated facilities. The cases on which the district court relied—concerning preemption of state tort laws unrelated to food safety and bans on specific types of meat for reasons unrelated to food safety—do not counsel a different result.

### A. The PPIA preempts additional or different state requirements, and there is no categorical sales-ban exception.

The PPIA contains two express preemption provisions relevant here, both codified at 21 U.S.C. § 467e. The first—the Facilities Clause—provides that "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State." *Id.* The second—the Ingredients Clause—provides that "[m]arking, labeling, packaging, or ingredient

requirements . . . in addition to, or different than, those made under this chapter may not be imposed by any State . . . with respect to articles prepared at any official establishment in accordance with the requirements under this chapter." *Id.*

Neither provision requires a direct conflict between state and federal law. All that matters is whether a state requirement is "in addition to, or different than" federal requirements. The Supreme Court confirmed this when construing the materially identical preemption language in the Federal Meat Inspection Act. In *National Meat Association v. Harris*, the Court held that the FMIA's preemption clause "sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements" within the statute's scope. 565 U.S. 452, 459–60 (2012).

The Sixth Circuit reached the same conclusion in *Armour & Co. v. Ball*, which applied the FMIA's materially identical ingredients preemption provision. 468 F.2d 76 (6th Cir. 1972). Michigan prohibited the sale of sausage that did not meet state "grade 1" standards, including a requirement that sausage not be made from organ meat. *Id.* at 79, 81–82. The Sixth Circuit held those ingredient standards were preempted because Congress had fixed the exclusive federal standards. *Id.* at 84. Michigan could not add restrictions the federal government had not imposed. Neither can Texas.

The district court's contrary rule—that a "complete sales ban" lies outside § 467e—is not in the statutory text. It is also inconsistent with *National Meat*. There, it was argued that the prohibition on selling meat from non-ambulatory pigs was merely a sales rule. *See* 565 U.S. at 463–64. The Supreme Court rejected that characterization because the sales ban functioned as a command to structure federally regulated operations in the way state law required. *Id.* The Court then explained that if a sales ban could avoid preemption, "any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.* at 464. That is this case. Texas has prohibited the sale of chicken produced in the federally regulated way Texas disapproves—by using cultivated chicken cells to produce meat.

### B. UPSIDE's cultivated chicken is a "poultry product" prepared at an "official establishment."

The PPIA's preemption provisions apply to (1) poultry products that are (2) prepared at official establishments. UPSIDE's cultivated chicken satisfies both requirements.

First, UPSIDE's product is a "poultry product." The PPIA defines that term to include not only "any poultry carcass, or *part thereof*," but also "any product which is made wholly or *in part* from any poultry carcass or part thereof." 21 U.S.C. § 453(f) (emphasis added). The phrases "part thereof" and "in part" matter.

Congress did not limit coverage to products made exclusively from a carcass. It covered any product made even partly from a carcass or part of a carcass.

UPSIDE's product fits that text. UPSIDE's cultivated chicken is produced by taking cells from a slaughtered chicken—part of a poultry carcass—and then growing those cells. *See* ROA.359 (¶¶ 14, 17). Once slaughtered, that chicken was a poultry carcass. The cells taken from that carcass were a "part thereof." 21 U.S.C. § 453(f). And because UPSIDE's product is made in part from those cells, it is made "in part from" a "part" of a poultry carcass.[4] *Id.* The result of that process is a poultry product within the exclusive regulatory ambit of the USDA. Cultivated chicken is, by federal definition, a poultry product.

The federal government's treatment of cultivated chicken confirms that reading. The USDA-Food Safety and Inspection Service (FSIS) has characterized cell-cultured chicken as a "poultry food product" and has stated that cell-cultured poultry products are subject to the same statutory requirements, regulations, and FSIS oversight as poultry food products derived from slaughter. U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products*, at 1–2 (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf

[4] The statute has exceptions, but it is undisputed that they do not apply.

(FSIS Directive 7800.1). That federal treatment confirms that UPSIDE's cultivated chicken falls within the PPIA.

Second, UPSIDE's production facility is an "official establishment" under the PPIA—an establishment "at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained" by the Secretary. 21 U.S.C. § 453(p). UPSIDE has received a USDA Grant of Inspection, which subjects its facility to on-going federal oversight as an official establishment. *See* ROA.363 (¶¶ 37–38).

**C. SB 261 is likely preempted under the PPIA's Ingredients Clause.**

The PPIA's Ingredients Clause preempts state "ingredient requirements . . . in addition to, or different than" federal requirements "with respect to articles prepared at any official establishment." 21 U.S.C. § 467e. "Ingredient requirements" refer to "the physical components that comprise a poultry product." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017).

Under federal law, UPSIDE's cultivated chicken cells may be used in its finished poultry product. FSIS Directive 7800.1 treats cell-cultured poultry products as subject to the PPIA and FSIS oversight. *See* FSIS Directive 7800.1, at 1–2. Critically, UPSIDE's USDA-FSIS-approved label describes the product as made "from chicken cells" and identifies "cell-cultivated chicken" as its primary ingredient. *See*

ROA.27, 363 (¶ 38). In other words, chicken cells are the defining physical component of the finished food.

SB 261 imposes an ingredient requirement that is different than the PPIA's Ingredients Clause. The law forbids UPSIDE from selling a federally inspected poultry product based on the component from which that article is made. That component is an ingredient under the PPIA's Ingredients Clause because it is a physical component that comprises a poultry product. UPSIDE's federally approved label confirms as much. Again, that label describes UPSIDE's product as containing "cell-cultivated chicken" as the primary ingredient. *See* ROA.27, 363 (¶ 38).

SB 261 prohibits sale of that food because of that ingredient. The statute defines "cell-cultured protein" as "a food product derived from harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue," and it prohibits offering to sell or selling such a product for human consumption. Tex. Health & Safety Code §§ 431.002(5-a), 431.02105(a). That definition turns on the physical source and composition of the product: "animal cells" replicated into tissue. As applied to UPSIDE, SB 261 prohibits its product because the product is produced from chicken "cells." A state requirement that forbids a federally inspected poultry product because it contains that federally recognized cellular

component is an ingredient requirement "different than" federal requirements. 21 U.S.C. § 467e.

Texas will argue—as Florida successfully argued in the Eleventh Circuit—that the ban regulates only the end product, not ingredients. *See Upside Foods, Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 171 F.4th 1239, 1256–57 (11th Cir. 2026). That response elevates form over substance because, here, the forbidden product is defined by the presence of a specific ingredient—cultivated chicken cells—that are produced from animals the state allows to be slaughtered for food. That fact distinguishes this case from others, in which states have banned products based on animal husbandry practices the state has forbidden.

The Ninth Circuit's decision in *Canards* illustrates the point. California's foie-gras law targeted force-feeding—"the way the animals are raised"—not the physical components of the finished poultry product. *Canards*, 870 F.3d at 1147. Texas is doing something different. It is not regulating husbandry practices for live chickens, nor is it prohibiting chickens from being slaughtered. It is forbidding sale of a finished poultry food because it is made from cultivated chicken cells—the physical component identified on UPSIDE's federal label and produced under federal oversight. That is why *Canards* does not control.

**D. SB 261 is likely preempted under the PPIA's Facilities Clause.**

Separate from the PPIA's Ingredients Clause, SB 261 is also preempted by the PPIA's Facilities Clause.

The PPIA's Facilities Clause preempts state "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter." 21 U.S.C. § 467e.

Federal law regulates cell-cultured poultry through an FDA/USDA-FSIS framework. *See* FSIS Directive 7800.1, at 1–2. At the FSIS-regulated stage, establishments producing cell-cultured meat or poultry food products "may distribute the raw harvested cells in commerce or process the harvested cells into finished products." *Id.* at 2. And UPSIDE operates under a federal Grant of Inspection. ROA.363 (¶ 38). Thus, under the federal regime, UPSIDE may harvest cultured chicken cells at the FSIS-regulated point, process cells into finished cultivated chicken, label that product, and sell the resulting federally inspected poultry product. What is more, the federal government has onsite inspectors during UPSIDE's production operations. ROA.363 (¶ 38).

Even though the federal government has concluded that UPSIDE's process, facility, and product are both lawful and safe, SB 261 imposes a different

requirement. SB 261 defines the prohibited product by that same cell-culture process—"harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue"—and then bars sale of the resulting food for human consumption. Tex. Health & Safety Code §§ 431.002(5-a), 431.02105(a). The law therefore tells an official establishment that, for any product destined for Texas, it must not harvest or process cell-cultured poultry into finished chicken tissue for human consumption. That process-based requirement "impacts [UPSIDE's] operations," so it is "within the scope of the [PPIA's] preemption clause." *See Nw. Selecta, Inc. v. González-Beiró*, 145 F.4th 9, 17–18 (1st Cir. 2025). Because that state requirement impacting operations "is absent from the PPIA," it is necessarily "'in addition to or different' than the PPIA's requirements." *See id.* at 16.

*National Meat* confirms the point. There, the Supreme Court held that the relevant question is whether, under federal law, an establishment may take one course of action, while under state law it must take another. *National Meat*, 565 U.S. at 460. Here, federal law allows UPSIDE to use a federally inspected cell-cultivation operation to produce and sell cultivated chicken. Texas law says the resulting product may not be sold because it was produced by that operation. That is not a mere downstream sales policy detached from production. It is a state rule aimed at "meat produced in whatever way the State disapproved." *Id.* at 464. Just as California could

not reach into a federally regulated facility to regulate the handling of pigs differently than federal law allows, Texas cannot reach into a federally regulated facility to regulate the processing of slaughtered chickens' tissue differently than federal law allows.

This Court's decision in *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry* does not compel a different result. 476 F.3d 326 (5th Cir. 2007). *Empacadora* involved a state ban on horse meat for human consumption. *Id.* at 330. There, the plaintiffs brought a claim under the FMIA's facilities clause—not the FMIA's ingredients clause. *See id.* at 333. In rejecting the FMIA facilities clause claim, this Court reasoned that there was no comparable need for uniform federal standards governing "what types of meat states permit to be sold." *Id.* at 334. But SB 261 does not decide that Texans cannot eat chicken. Texas allows chicken to be sold for consumption. What SB 261 reaches is how chicken is produced within a federally regulated facility.

There is a legally significant line between before and after an article enters a federally regulated facility. *Empacadora*, *National Meat*, and *Canards* illustrate the physical boundary line: States may reach activities occurring outside the federally regulated facility, but they cannot dictate operations within it. This includes stopping horses from entering a regulated facility altogether (*Empacadora*) and prohibiting

force-feeding practices that occur before birds reach the slaughterhouse (*Canards*). Those kinds of laws kick in "at a remove from the sites and activities that the FMIA most directly governs." *See National Meat*, 565 U.S. at 466–67. Neither horses nor birds reach a federally regulated facility.

States, however, cannot reach activities happening *within* the federally regulated facility, such as how to treat animals once they are within the facility (*National Meat*). So whether SB 261 is preempted by the PPIA hinges on whether the Texas law reaches activity before or after the animals enter the federally regulated facility.

Here, SB 261 reaches activity after poultry enters a federally regulated facility. A chicken enters UPSIDE's federally regulated facility and then is slaughtered. *See* ROA.51–52 (¶ 252), 56 (¶ 274), 359 (¶ 17). At that point, the chicken cells are extracted and then later supplied oxygen and nutrients to produce a poultry product. *See* ROA.359 (¶¶ 14, 17). In this way, "cultivated" describes a post-slaughter process of producing a poultry product—a process regulated by the federal government under the PPIA.

To illustrate how SB 261 affects the operations of a federally regulated poultry facility, consider two scenarios. In one scenario, a chicken is slaughtered and its meat is packaged for sale. In a second scenario, a chicken is slaughtered, its cells are cultured, and the resulting cultivated meat is packaged for sale. SB 261 reaches into the

facility to criminalize only the second scenario, thereby dictating which federally approved processes are permissible. Unlike *Empacadora*, where the species was barred from entry, or *Canards*, where the ban targeted pre-slaughter husbandry, SB 261 permits the chicken to enter the facility for slaughter and then restricts what can happen to the carcass afterward. So SB 261 targets a specific operation performed on a species that has already fallen under federal inspection—the precise operational domain the PPIA preempts.

In sum, cultivated meat defines the process to produce meat. The PPIA and federal government regulate that process. And a state cannot ban chicken just because it is made in the way the state disapproves.

Finally, the district court also relied on this Court's decision in *Williams v. Wingrove* to narrow its interpretation of the PPIA. *See* ROA.573. *Williams* involved state-law negligence claims for workplace COVID-19 exposure at a Tyson meatpacking plant. 153 F.4th at 459–60. This Court held those claims were not preempted because Tyson had made no connection between the alleged duty to prevent COVID-19 spread and food-product safety. *Id.* at 463. That holding does not help Texas. SB 261 is not a workplace-safety tort claim unrelated to food. In this litigation, Texas has defended SB 261 as a health-and-safety measure designed to protect

consumers from allegedly unsafe cell-cultured protein. ROA.441. That justification places SB 261 in the food territory *Williams* identified as the PPIA's domain.

* * *

UPSIDE has shown that its product is made in part from a poultry carcass, prepared in an official establishment, and banned by Texas because of its cellular ingredient and federally supervised production process. That is enough, at minimum, to establish a substantial likelihood of success. The district court erred when it concluded that there is not a likelihood of success on the merits of the Supremacy Clause claims.

## CONCLUSION

This Court should reverse the district court's denial of Wildtype and UPSIDE's motion for preliminary injunction and remand.

Dated: June 2, 2026.

Respectfully submitted,

<u>*/s/ Marco Vasquez Jr.*</u>

INSTITUTE FOR JUSTICE

Marco Vasquez Jr.
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
mvasquez@ij.org

Paul M. Sherman
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
psherman@ij.org

*Counsel for Plaintiffs-Appellants*
*Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service on all counsel of record will be accomplished by the appellate CM/ECF system.

*<u>/s/ Marco Vasquez Jr.</u>*
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 12,346 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2024 in 14-point Equity font.

*/s/ Marco Vasquez Jr.*
*Counsel for Plaintiffs-Appellants*