No. 26-50181

# In the United States Court of Appeals for the Fifth Circuit

Wild Type, Incorporated, doing business as WildType; Upside Foods, Incorporated,
Plaintiffs–Appellants,

v.

Jennifer Shuford, in her official capacity as Commissioner of State Health Services; Cecile Erwin Young, in her official capacity as Executive Commissioner of the Texas Department of Health and Human Services Commission; Ken Paxton, Attorney General, State of Texas, in his official capacity; Delia Garza, in her official capacity as the County Attorney of Travis County,
Defendants–Appellees.

On Appeal from the United States District Court for the Western District of Texas, Austin Division

## BRIEF FOR APPELLEES

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General

D. Bowie Duncan
Assistant Solicitor General
Bowie.Duncan@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellees*

# Certificate of Interested Persons

No. 26-50181

Wild Type, Incorporated, doing business as WildType;
Upside Foods, Incorporated,

Plaintiffs–Appellants,

v.

Jennifer Shuford, in her official capacity as Commissioner of State Health Services; Cecile Erwin Young, in her official capacity as Executive Commissioner of the Texas Department of Health and Human Services Commission; Ken Paxton, Attorney General, State of Texas, in his official capacity; Delia Garza, in her official capacity as the County Attorney of Travis County,

Defendants–Appellees.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Defendant–Appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ D. Bowie Duncan
D. Bowie Duncan
*Counsel for Defendants-Appellees*

## Statement Regarding Oral Argument

The State Defendants agree that the Court would benefit from oral argument in this case. The district court declined to preliminarily enjoin enforcement of a Texas law against Plaintiffs because they failed to show that they were irreparably harmed by the law or that the equities favored an injunction. This case presents important questions regarding the dormant Commerce Clause, federal preemption, and the appropriate standard to apply to motions for preliminary injunction in cases involving constitutional claims.

# Table of Contents

Page

Certificate of Interested Persons ........ ii
Statement Regarding Oral Argument ........ iii
Table of Authorities ........ vi
Statement of Jurisdiction ........ 1
Issues Presented ........ 2
Introduction ........ 3
Statement of the Case ........ 5
- I. Cultivated Meat Is a New, Lab-Grown Product ........ 5
- II. The Legislature Enacts S.B. 261 to Protect Against a Health Risk ........ 7
- III. Wildtype and Upside Produce Cultivated Salmon and Chicken ........ 12
- IV. Wildtype and Upside Sue; the District Court Denies Preliminary Relief ........ 13

Summary of the Argument ........ 16
Standard of Review ........ 19
Argument ........ 20
- I. The District Court Was Not Required to Consider Likelihood of Success on the Merits ........ 21
- II. Plaintiffs Are Not Likely to Succeed on Their Dormant Commerce Clause Claim ........ 23
  - A. S.B. 261 was not enacted with a discriminatory purpose. ........ 24
    - 1. S.B. 261's purpose is to protect Texans' health. ........ 25
    - 2. S.B. 261 treats in-state and out-of-state companies the same. ........ 28
    - 3. A discriminatory purpose is not dispositive. ........ 29
  - B. S.B. 261 does not have a discriminatory effect on interstate commerce. ........ 30
    - 1. Cultivated meat is not similarly situated to traditional meat. ........ 30
    - 2. S.B. 261's effect on interstate commerce is *de minimis*. ........ 33
  - C. In any case, S.B. 261 passes heightened scrutiny. ........ 34
- III. Upside Is Not Likely to Succeed on Its Preemption Claim ........ 37

A. The PPIA's facilities provision does not preempt S.B. 261................ 39

1. The text of the facilities provision does not preempt a sales ban of an end product.................................................................. 39

2. Precedent confirms that the facilities provision does not preempt a sales ban of an end product........................................ 42

3. Upside's arguments to the contrary are unpersuasive. ............... 44

B. The PPIA's ingredients provision does not preempt S.B. 261. .......... 46

IV. Plaintiffs Failed to Establish the Remaining Preliminary-Injunction Factors ........................................................................... 49

Conclusion and Prayer ........................................................................... 52

Certificate of Compliance ........................................................................ 53

# Table of Authorities

Page(s)

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) ... 26

*AbbVie, Inc. v. Murrill*,
166 F.4th 528 (5th Cir. 2026) ... 23, 51

*Allstate Ins. Co. v. Abbott*,
495 F.3d 151 (5th Cir. 2007) ... 16, 23, 24, 25, 27

*Am. Trucking Ass'ns, Inc. v. Alviti*,
14 F.4th 76 (1st Cir. 2021) ... 29

*Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*,
123 F.4th 27 (1st Cir. 2024) ... 33–34

*Anibowei v. Morgan*,
70 F.4th 898 (5th Cir. 2023) ... 21

*Armour & Co. v. Ball*,
468 F.2d 76 (6th Cir. 1972) ... 48

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013) ... 29

*Associated Indus. of Mo. v. Lohman*,
511 U.S. 641 (1994) ... 22, 32

*Association des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017) ... 47

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) ... 33

*Black Fire Fighters Ass'n of Dallas v. City of Dallas*,
905 F.2d 63 (5th Cir. 1990) ... 21

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ... 22

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .................................................................... 22

*Cavel Int'l, Inc. v. Madigan*,
500 F.3d 551 (7th Cir. 2007) .................................................................... 43

*Churchill Downs Inc. v. Trout*,
589 F. App'x 233 (5th Cir. 2014) .............................................................. 32

*Comptroller of Treasury of Md. v. Wynne*,
575 U.S. 542 (2015) .................................................................................. 29

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) .................................................................... 50

*Defense Distributed v. U.S. Dep't of State*
838 F.3d 451 (5th Cir. 2016) ........................................................ 21–22, 51

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
476 F.3d 326 (5th Cir. 2007) ........................... 16, 17, 28, 29, 42, 43, 46–47

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117, 126 (1978) .......................................................................... 34

*Ford Motor Co. v. Tex. Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) .................................................................... 31

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ................................................. 17, 25–26, 30, 31, 32, 33

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................................................................................. 24

*Huskey v. Jones*,
45 F.4th 827 (5th Cir. 2022) ...................................................................... 8

*Int'l Truck & Engine Corp. v. Bray*,
372 F.3d 717 (5th Cir. 2004) .................................................................... 29

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
563 U.S. 1 (2011) ...................................................................................... 41

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ........................................................................................ 41

*Lauren C. by & through Tracey K. v. Lewisville Indep. Sch. Dist.*,
904 F.3d 363 (5th Cir. 2018) ........................................................................ 23

*Maine v. Taylor*,
477 U.S. 131 (1986) ........................................................16, 24, 25, 34, 35, 36, 51

*Maryland v. Louisiana*,
451 U.S. 725 (1981) ......................................................................................... 38

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) (per curiam) ..................................................................... 22

*Monsanto Co. v. Durnell*,
No. 24-1068, 2026 WL 1825691 (U.S. June 25, 2026) ................................ 48, 49

*Moore v. Brown*,
868 F.3d 398 (5th Cir. 2017) (per curiam)..........................................................19

*Mullin v. Doe*,
No. 25–1083, 2026 WL 1825840 (U.S. June 25, 2026) ..................................... 41

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
567 F.3d 521 (9th Cir. 2009) .............................................................................31

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ......................................................................................... 24

*Nat'l Meat Assoc. v. Harris*,
565 U.S. 452 (2012) ......................................................................................... 45

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................. 20, 50

*Or. Waste Sys., Inc. v. Dep't of Env't. Quality of State of Or.*,
511 U.S. 93 (1994) ........................................................................................... 30

*Patel v. Garland*,
596 U.S. 328 (2022) ......................................................................................... 41

*Siders v. City of Brandon*,
123 F.4th 293 (5th Cir. 2024) .......... 19

*Space Expl. Techs. Corp. v. Nat'l Lab. Rel. Bd.*,
151 F.4th 761 (5th Cir. 2025) .......... 22

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) .......... 36

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007) .......... 28

*Upside Foods Inc v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
171 F.4th 1239 (11th Cir. 2026) .......... 17, 39, 40, 41, 42, 43, 45, 46, 47, 48

*U.S. Postal Serv. v. Konan*,
607 U.S. 391 (2026) .......... 39, 46

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) .......... 25

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) (per curiam) .......... 51

*Voting for Am., Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) .......... 20, 21

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
945 F.3d 206 (5th Cir. 2019) .......... 25, 28, 29, 31, 33, 36

*White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*,
420 F.3d 366 (5th Cir. 2005) .......... 38

*Williams v. Winegrove*,
153 F.4th 455 (5th Cir. 2025) .......... 15, 43–44

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) .......... 37

**Constitutional Provisions, Statutes, Regulations, and Rules**

21 U.S.C.

§ 451 .......... 14, 38, 48

§ 452 .......... 14, 38, 44

§ 453(e)–(f) .......... 38

§ 453(h)(7) .......... 48

§ 453(p) .......... 38, 41

§§ 455–57 .......... 14, 38

§ 466(a) .......... 48

§ 467e .......... 14, 38, 39, 42, 46

§ 603(a) .......... 38, 42

§ 678 .......... 38, 42

28 U.S.C.

§§ 1331, 1343 .......... 1

§1292 .......... 1

Ala. Code § 20-1-161 (2024) .......... 6

Cal. Penal Code § 599f (2010) .......... 45

Fla. Stat. § 500.452 (2024) .......... 6

Ind. Code § 15-17-5-6.1 (2025) .......... 6

Miss. Code § 75-35-15 (2025) .......... 6

Mont. Code § 50-31-501 (2025) .......... 6

Neb. Rev. Stat. § 81-2,282 (2025) .......... 6

S.D. Codified Laws § 39-5-57 (2026) .......... 6

Tex. Health & Safety Code

§ 431.002(5-a) .......... 7

§ 431.02105(a) .......... 7, 39

§ 431.02105(c) .......... 7

9 C.F.R. § 424.21(c) .......... 48

Federal Rules of Civil Procedure

12(b)(1) .......... 14

12(b)(6) .......... 14

25(d) .......... 14

**Other Authorities**

Amend. Proposal to Tex. S.B. 261 on the Floor of the Tex. S., 89th Leg., R.S. (May 12, 2025) .......... 27

Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 Harv. J.L. & Pub. Pol'y 743 (2012) .......... 22

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012) .......... 40, 41

Debate on Tex. S.B. 261 on the Floor of the Tex. H.R., 89th Leg., R.S. (May 24, 2025) .......... 8, 9, 26, 35

Debate on Tex. S.B. 261 on the Floor of the Tex. H.R., 89th Leg., R.S. (May 25, 2025) .......... 8

Hearings on HB 1431 Before the Tex. H. Comm. on Pub. Health, 89th Leg., R.S. (Apr. 7, 2025) .......... 5, 6, 7, 10, 11, 12, 26, 29, 31, 32, 35, 36

Hearings on S.B. 261 Before the Tex. S. Comm. on Water, Agric., and Rural Affs., 89th Leg., R.S. (Mar. 31, 2025)....................................6, 9, 10, 35, 36

Lisa S. Benson and Eleni G. Bickell, *Cell-Cultivated Meat: An Overview*, Cong. Rsch. Serv., R47697 (Sept. 19, 2023)........................................ 6

*Webster's Third New International Dictionary* (1st ed. 1961) ............................. 40, 46

## Statement of Jurisdiction

The district court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs allege that S.B. 261 violates the U.S. Constitution. The district court denied Plaintiffs' motion for preliminary injunction on January 30, 2026. ROA.565–75. Plaintiffs timely filed their notice of appeal on February 26, 2026. ROA.616–18. This Court has appellate jurisdiction under 28 U.S.C. § 1292.

## Issues Presented

Plaintiffs are two California-based cultivated meat companies with essentially no market in Texas. They allege that S.B. 261, a Texas law that bans the sale of cultivated meat in the State for two years, violates the dormant Commerce Clause and is preempted by the Poultry Products Inspection Act. The district court dismissed the preemption claim and, without addressing the merits of the dormant Commerce Clause claim, found that a preliminary injunction was not warranted because Plaintiffs were not irreparably harmed by S.B. 261 and the balance of the equities did not favor an injunction. The issues are:

1. Whether the district court was required to address Plaintiffs' likelihood of success on their dormant Commerce Clause claim even though the court determined that they had not met two other requirements for a preliminary injunction.
2. Whether Plaintiffs failed to establish a likelihood of success on their dormant Commerce Clause claim.
3. Whether Plaintiff Upside Foods failed to establish a likelihood of success on its preemption claim.
4. Whether the district court abused its discretion by determining that Plaintiffs failed to show either that they were irreparably harmed or that the equities favored relief.

# Introduction

Cell-cultivated meat is a new, lab-grown "meat" product. It is produced by placing biopsied animal cells in a bioreactor, where the cells grow and multiply before being harvested and shaped into something resembling real meat. Because the production process does not involve animal slaughter, cultivated meat appeals to people who would not eat traditional meat for ethical reasons.

In legislative debates and hearings, members of the Texas Legislature repeatedly voiced concerns about the unknown, long-term health consequences of consuming cultivated meat. In the words of one member: "We're talking about something we're creating that didn't exist before, and we're talking about *feeding it to people*." The Legislature responded to these concerns by enacting S.B. 261, which prohibits the sale of cultivated meat in Texas for two years (until September 2027).

Wildtype and Upside Foods are California companies that make cultivated salmon and chicken, respectively, not cultivated beef. Before S.B. 261 went into effect, Wildtype's salmon had been offered for sale at only one Texas-based restaurant, and Upside's chicken had been purchased by one "resident of West Lake Hills, Texas." Despite these paltry sales, the two companies sought to preliminarily enjoin enforcement of S.B. 261, which they allege violates the dormant Commerce Clause and is preempted by the Poultry Products Inspection Act (PPIA).

The district court correctly found that Plaintiffs were not irreparably harmed by S.B. 261 and that the equities did not favor injunctive relief. Although the court did not reach, and was not required to reach, likelihood of success on the merits, the record also shows that Plaintiffs are not likely to succeed on their claim that S.B. 261

violates the dormant Commerce Clause. The law is facially neutral (and in fact applies to an Austin-based cultivated meat company) and does not discriminate against interstate commerce in either purpose or effect. Nor is S.B. 261 preempted by the PPIA's facilities or ingredients provisions, as the Eleventh Circuit recently held in a nearly identical case brought by Upside.

# Statement of the Case

## I. Cultivated Meat Is a New, Lab-Grown Product

Cell-cultivated meat is "animal-based meat," grown in a lab. *See* Hearings on HB 1431 Before the Tex. H. Comm. on Pub. Health, 89th Leg., R.S., at 5:26:10 (Apr. 7, 2025) (Uma Valenti) [hereinafter, House Committee Hearing].[1] Producing cultivated meat involves several steps, including extracting cells from animals; placing those cells in a large tank called a bioreactor; supplying the cells with oxygen and nutrients so they can grow and multiply; and then "harvest[ing]" the resulting cells and forming them "into food products that have a similar taste, texture, and appearance as [traditional] meat." *See* ROA.359.

Apart from being grown in a lab, cultivated meat differs from traditional meat—or what Plaintiffs call "conventional" meat—in three ways: (i) it is a new, imperfectly understood product, (ii) it is extraordinarily costly to produce, and (iii) it appeals to people who would otherwise not eat meat.

*First*, cultivated meat is a new product, and its long-term health effects are unknown. As the CEO of Upside stated in an affidavit, "cultivated meat is a nascent industry." ROA.361. Singapore was the first country to authorize the sale of cultivated meat in 2020. ROA.431. Only five other countries have green-lit the product since then: Australia, Hong Kong, Israel, New Zealand, and the United States. *See* House Committee Hearing at 4:26:18, 4:53:05. In the United States, Upside made the first sale of cultivated meat in July 2023. ROA.363.

---

[1] Available at https://house.texas.gov/videos/21658.

Because cultivated meat is so new, "there has been no long-term research" on the effects of consuming the product. *See* Hearings on S.B. 261 Before the Tex. S. Comm. on Water, Agric., and Rural Affs., 89th Leg., R.S., at 3:17:45–3:18:10 (Mar. 31, 2025) (Carl Ray Polk) [hereinafter, Senate Committee Hearing].[2] In other words, the health effects are imperfectly understood, which has motivated seven States other than Texas to ban cultivated meat either indefinitely or for a limited time. *See* Ala. Code § 20-1-161 (2024); Fla. Stat. § 500.452 (2024); Ind. Code § 15-17-5-6.1 (2025) (two-year moratorium); Miss. Code § 75-35-15 (2025); Mont. Code § 50-31-501 (2025); Neb. Rev. Stat. § 81-2,282 (2025); S.D. Codified Laws § 39-5-57 (2026) (five-year moratorium).

*Second*, the cost of producing cultivated meat is extraordinarily high. The first cultivated meat product made for human consumption (in 2013) cost $330,000 to produce. Lisa S. Benson and Eleni G. Bickell, *Cell-Cultivated Meat: An Overview*, Cong. Rsch. Serv., R47697 (Sept. 19, 2023).[3] Although costs have since fallen, cultivated meat remains much more expensive than traditional meat. For example, during a committee hearing on S.B. 261's companion bill in the Texas House of Representatives, the CEO of Upside testified that Upside sells its cultivated chicken product for "approximately $200 a pound." House Committee Hearing at 5:19:38. He acknowledged that cultivated meat is functionally a delicacy because of the cost

[2] Available at https://senate.texas.gov/videoplayer.php?vid=21497&lang=en.

[3] Available at https://www.congress.gov/crsproduct/R47697.

of production, *id.* at 5:21:58, and that the cultivated meat industry is "not a threat to anyone right now," *id.* at 5:19:12.

*Third*, the target consumer for cultivated meat is not the same as the target consumer for traditional meat. Cultivated meat companies market their products to consumers who have ethical or environmental scruples about traditional agriculture, which involves raising and slaughtering animals. *See* ROA.320–22, 360. Upside's CEO confirmed this during the committee hearing mentioned above. *See* House Committee Hearing at 5:06:13. He also testified that he himself does not eat traditional meat for ethical reasons but does eat cultivated meat. *Id.* at 5:33:21. A Texas rancher who testified in favor of the bill agreed that "a lot of people that are going to eat this product are not going to eat mine." *Id.* at 4:34:00–06.

## II. The Legislature Enacts S.B. 261 to Protect Against a Health Risk

Faced with the prospect of a potentially harmful product being sold within the State, the Texas Legislature enacted Senate Bill 261 on June 20, 2025. S.B. 261 provides that "[t]he offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited." Tex. Health & Safety Code § 431.02105(a). The statute defines "[c]ell-cultured protein" as "a food product derived from harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue." *Id.* § 431.002(5-a). The law went into effect on September 1, 2025, and expires on September 1, 2027. *Id.* § 431.02105(c).

In debating S.B. 261 before it was passed, members of the Texas Legislature were concerned, primarily, about the long-term health implications of the product.[4] Representative Stan Gerdes, S.B. 261's sponsor in the House, began his remarks during a House floor debate by stating: "Members, S.B. 261 is about protecting Texans from being a science experiment." Debate on Tex. S.B. 261 on the Floor of the Tex. H.R., 89th Leg., R.S., at 00:32:34–37 (May 25, 2025) [hereinafter, Second House Floor Debate].[5] He later explained that S.B. 261 "put[s] a two-year pause" on the sale of cultivated meat "so the State of Texas can have some time to create a fair and equitable regulatory framework for this type of new cell-cultured protein." *Id.* at 00:33:42–56.

Representative Gerdes made similar remarks on the House floor the day before. Near the start, he stated: "The fact is, we do not fully understand how genetically engineered or lab cultured cells interact with the cells in the human body. Beyond that, we also fully don't understand at a basic level what is in these products." Debate on Tex. S.B. 261 on the Floor of the Tex. H.R., 89th Leg., R.S., at 7:41:23–34 (May 24, 2025) [hereinafter, First House Floor Debate].[6] He closed by stating, "[R]ight now, my job is to protect the folks of Texas and make sure that if things are coming to market, that there a – there are safeguards in place to make sure it's safe

---

[4] During the preliminary-injunction hearing, the State Defendants read time stamps from several legislative hearings into the record. ROA.684–86. This Court may also take judicial notice of the videos of the hearings because they are hosted on a government website. *See Huskey v. Jones*, 45 F.4th 827, 831 n.3 (5th Cir. 2022).

[5] Available at https://house.texas.gov/videos/22258#.

[6] Available at https://house.texas.gov/videos/22257.

for human consumption. We don't need our dinner plate to be [turned] into a science experiment." *Id.* at 7:46:00–14.

Before the bill reached the floor of either chamber, two committees—one in the Senate and one in the House—held hearings on S.B. 261 (or, in the House, its companion bill, H.B. 1431). Much of the testimony and statements at these hearings concerned the potential risks of consuming cultivated meat.

One of the hearings took place before the Senate Committee on Water, Agriculture, and Rural Affairs. In introducing S.B. 261 to the Committee, Senator Charles Perry explained that the bill was necessary in part because of "concerns over the . . . risk of contamination and long-term health implications of consuming cell-cultured products." Senate Committee Hearing at 3:14:48–3:15:04.

Carl Ray Polk, a witness from the Texas & Southwestern Cattle Raisers Association, expanded on the risks Senator Perry identified. He testified that "as these new 'meat experiences' emerge, significant concerns exist, as chairman Perry outlined, to the continued growth about—continued concern, about the long-term safety and effects on humans." *Id.* at 3:17:45–3:18:10. Polk also noted the lack of long-term research on cultivated meat: "Because these products are so new, there has been no long-term research. Studies that can provide safety and measures have not yet been performed." *Id.* And he highlighted some existing research that suggests that cultivated meat is not safe to consume:

> Research shows that lab grown cells are prone to becoming contaminated with microplastics during the production process which can disrupt human cell membranes. Furthermore, it's the use of antibiotics during the production that raises fears about the antibiotic

> resistance. There are also a few unsolved questions regarding how some of these genetic improved cells might have once behaved when ingested by humans.

*Id.* at 3:18:10–38.

Former Texas State Representative and rancher Dan Gattis testified next. His testimony stressed the difference between inadequately tested lab-grown meat and "natural, well-tested, and well-regulated" traditional meat. *Id.* at 3:21:15–3:21:22. After Gattis's opening remarks, Senator Lois Kolkhorst asked him whether cultivated meat is "part of" or "against" the effort to "Make America Healthy Again." *Id.* at 3:26:00–50. Gattis responded, "I would see the lab-grown meat as against it." *Id.* at 3:26:50–53. He continued:

> In a time when we are trying to rid our food of all sorts of added products, dyes, and all of those types of things and understanding finally what their impact really is to our ultimate health, you have a group of companies that is going to be the actually - the quintessential top of the manufactured food product highly processed.

*Id.* at 3:26:53–3:27:16.

The House Committee on Public Safety also heard testimony on the risks of consuming cultivated meat. Representative Gerdes introduced H.B. 1431 to the committee and, as he did on the House floor, emphasized concerns about the "risk of contamination [and the] long-term health impacts of consuming cell-cultured products." House Committee Hearing at 4:19:01–07. In response to a question about the "effect on our body" of consuming cultivated meat, Gerdes said that the results are not yet in: "TBD." *Id.* at 4:20:18–50.

Several witnesses testified at the House committee hearing. Representative John Bucy III asked the first of these, from the Texas Department of State Health Services (DSHS), "Do you know of any reason why this would be a health risk—a public safety, public health risk?" *Id.* at 4:22:27–34. The DSHS witness responded: "Personally, I don't have any information on that." *Id.* at 4:22:34–38.

Polk and Gattis then testified in favor of the bill, as they did before the Senate Committee. *Id.* at 4:23:28–4:51:38. During his testimony, Gattis directly responded to Representative Bucy's question to the DSHS witness: "The concern, to answer Representative Bucy [is] what are the long-term implications, what are the long-term effects? We don't know. We really don't." *Id.* at 4:29:40–50. He continued:

> This is not the situation where we have long-term studies, long-term tests, how does the human body, does it utilize this in a different way than natural meats? *We don't know the answer to that.* What are the potential implications or safety concerns with regard to the production? All those different stages of production, we don't necessarily know all the answers behind that. That is the basic issue that we have got. We have a brand new, novel concept that we are wanting to put out there basically, in my mind, *utilizing our citizens as test subjects*.

*Id.* at 4:30:23–4:31:00 (emphases added). Representative Mike Schofield later agreed that these uncertainties warranted a ban: "It would be one thing if we found a new animal and, you know, said 'okay we are going to have this meat.' We're talking about something we're creating that didn't exist before, and we're talking about feeding it to people." *Id.* at 4:45:00–13.

To be sure, legislators occasionally referred to the impact cultivated meat might have on traditional forms of agriculture. However, these remarks were outnumbered

by remarks about the possible risks of consuming cultivated meat. Witnesses on both sides also acknowledged that cultivated meat is not a competitive threat to traditional meat, including beef. For example, Upside's CEO testified that "we are not a threat to anyone right now," *id.* at 5:19:14, and emphasized that "we are not even selling beef by the way, we are selling chicken," *id.* at 4:55:12. And Gattis testified that "this fits into a different box, not the same as beef," *id.* at 4:38:32, and "a lot of people that are going to eat this product are not going to eat mine," *id.* at 4:34:06.

As a result of the two committee hearings, members of the Texas Legislature were also aware that S.B. 261 would impact cultivated meat companies located in the State. Katie Kam, the CEO of an Austin-based cultivated meat company, BioBQ, testified against the bill before both committees. *See* ROA.669. She explained that BioBQ had produced brisket bites that had been taste-tested and that a local barbeque business had expressed interest in putting the bites on its menu to reach new customers. Kam closed her testimony by urging the committee: "Please do not put me, a life-long Texan, out of business." *See* House Committee Hearing at 5:03:00.

## III. Wildtype and Upside Produce Cultivated Salmon and Chicken

Wild Type, Inc. ("Wildtype"), and Upside Foods, Inc. ("Upside"), are cultivated meat companies based in California. They are both start-ups, with limited market share. Neither Wildtype nor Upside sells cultivated beef.

Wildtype makes cultivated salmon. It was founded in 2016 and opened its first production facility in 2023. ROA.319–20. The company completed a pre-market consultation process with the FDA in 2025. At the conclusion of that process, it received a "no questions" letter from the FDA, which permitted it to sell its

cultivated salmon in the United States. ROA.323–24. Wildtype made its first sale in March 2025. ROA.324.

Wildtype entered the Texas market in July 2025, shortly after Governor Abbott signed S.B. 261 into law (on June 20, 2025), but before the law went into effect. In those two-and-a-half months, Wildtype sold its cultivated meat at one sushi restaurant in Austin. ROA.324. It also claims to have made "six sales trips" to Texas in the past and to have "spoke[n] with a number of potential customers in Texas." ROA325. But it did not elaborate on the nature of these trips or conversations in any pleadings or during the preliminary-injunction hearing.

Upside makes cultivated chicken. It was founded in 2015 and received a no-questions letter from the FDA in 2022. ROA.358–59, 362. Upside began selling cultivated chicken in the United States in July 2023. Like Wildtype, it has essentially no market for its product in Texas. Upside "sold its cultivated chicken product to a West Lake Hills, Texas, resident" in March 2024—one resident, over two years ago. ROA.363. Other than that, the company claims to have "spoke[n] with chefs in Austin, Texas," and to have "had conversations with supermarket chains in Texas regarding interest in selling Upside's cultivated chicken products." ROA.363.

## IV. Wildtype and Upside Sue; the District Court Denies Preliminary Relief

On September 2, 2025, Wildtype and Upside filed a complaint for injunctive and declaratory relief against several Texas state officials (collectively, "the State

Defendants"). ROA.10.[7] They alleged that S.B. 261 violates the dormant Commerce Clause because it was enacted with the purpose, and has the effect, of discriminating against competition coming exclusively from out of state. ROA.45–48.

As a producer of cultivated chicken, Upside also alleged that S.B. 261 is expressly preempted by the Poultry Products Inspection Act (PPIA). ROA.48–65. The PPIA empowers the Secretary of Agriculture to establish uniform federal standards for poultry products. 21 U.S.C. §§ 451, 455–57. It contains provisions preempting state laws that impose "facilities" or "ingredient" requirements that differ from federal law. *Id.* §§ 452, 467e.

Plaintiffs moved for a preliminary injunction based on their dormant Commerce Clause and preemption claims. ROA.157. In addition to responding to that motion, ROA.425, the State Defendants moved to dismiss both claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ROA.397.

The district court held a hearing on these motions on January 16, 2026. *See* ROA.621. Following the hearing, the court denied Plaintiffs' motion for preliminary injunction, granted the State Defendants' motion to dismiss Upside's preemption claim under Rule 12(b)(6), and denied the State Defendants' motion to dismiss the dormant Commerce Clause claim. ROA.565.

---

[7] One of the named Defendants, Cecile Erwin Young, has been succeeded by Stephanie Muth as Executive Commissioner of the Texas Health and Human Services Commission. Commissioner Muth has been substituted as a party. Fed. R. Civ. P. 25(d).

In denying the motion for preliminary injunction, the district court declined to address Plaintiffs' likelihood of success on their dormant Commerce Clause claim but found that Plaintiffs had failed to show that they were irreparably harmed by S.B. 261 or that the balance of the equities favored injunctive relief. The court found no irreparable harm "due to SB 261's two-year application period, and Plaintiffs' lack of contractual business already in place for Texas." ROA.574. "More importantly," it concluded that enjoining S.B. 261 "for the sake of allowing two companies who were only newly beginning to transact business in Texas, would not comport with the balance of equities." ROA.574–75.

In dismissing Upside's preemption claims, the district court agreed with the State Defendants that "the PPIA simply does not preempt SB 261." ROA.571. Relying on this Court's recent decision in *Williams v. Winegrove*, 153 F.4th 455, 463 (5th Cir. 2025), the court observed that the PPIA's express preemption clause "covers food safety as well as any behavior that would cause the adulteration of product." ROA.573. But the clause "does not reach complete sales bans. Complete sales bans do not alter whether food being sold is less safe than the PPIA would require, and a complete sales ban has nothing to do with adulterating chicken products." ROA.573. The court thus concluded that S.B. 261 is not preempted by the PPIA.

Plaintiffs appealed the district court's order denying their motion for preliminary injunction. ROA.616.

## Summary of the Argument

The district court correctly denied Plaintiffs' motion for preliminary injunction.

**I.** Because Plaintiffs failed to show that they were irreparably harmed by S.B. 261 or that the balance of the equities favored injunctive relief, the district court was not required to address Plaintiffs' likelihood of success on the merits of their dormant Commerce Clause claim. The preliminary-injunction test has four requirements. If a plaintiff fails to establish any one of them, then the plaintiff's motion must be denied. Nor does the fact that this case involves "constitutional claims" mean the court was required to reach the merits. This Court has affirmed denials of preliminary injunctions in cases involving constitutional claims without reaching the merits. It should do so again in this case.

**II.** If the Court decides to reach the merits, S.B. 261 does not violate the dormant Commerce Clause because it does not discriminate against interstate commerce "either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). The law "treats both intrastate and interstate trade of [cultivated meat] equally by way of a blanket prohibition." *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007) (upholding horsemeat ban). The legislative debates and hearings show that the purpose of the bill was not to discriminate against interstate commerce but to protect against the "imperfectly understood" risks of consuming cultivated meat. *See Maine v. Taylor*, 477 U.S. 131, 148 (1986). A few "stray remarks" from legislators about potential impacts on traditional agriculture do not transform the law's purpose into a discriminatory one. *See Allstate*, 495 F.3d at 161.

Nor is cultivated meat "similarly situated" to traditional meat, as would be required for S.B. 261 to be discriminatory in effect. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). The two products are different, have different consumer bases, and do not actually compete in the market for meat. And even if the products were similarly situated, S.B. 261 has only a *de minimis* effect on interstate commerce. Finally, although S.B. 261 is not discriminatory, it easily passes heightened scrutiny.

**III.** As the Eleventh Circuit recently held in a nearly identical case brought by Upside, the PPIA's facilities and ingredients provisions do not preempt S.B. 261. *Upside Foods Inc v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 171 F.4th 1239 (11th Cir. 2026). The facilities provision does not preempt S.B. 261 because its sales ban does not impose additional or different requirements as to the premises, facilities, or operations of Upside's establishment. And the ingredients provision does not preempt S.B. 261 because a sales ban on an end product is not an additional or different "ingredient" requirement. At a more basic level, the PPIA does not prevent a State from determining what types of poultry "may be sold for human consumption in the first place." *See Empacadora*, 476 F.3d at 333.

**IV.** Finally, the district court correctly denied Plaintiffs' request for a preliminary injunction because Plaintiffs failed to show that they were irreparably harmed by S.B. 261 or that the equities favored them. Plaintiffs' purported economic injuries are negligible: before S.B. 261 went into effect, Wildtype and Upside sold their product at one Texas restaurant and to one Texas resident, respectively. The other injuries they claim to have suffered based on "conversations" with potential customers are speculative. Regardless, any irreparable harm Plaintiffs suffer from

not being allowed to sell their product in Texas for two years is outweighed by the public interest in enforcing S.B. 261. The statute is designed to protect Texans from an imperfectly understood health risk, and the district court correctly held that enjoining the law "for the sake of . . . two companies" would not comport with the equities. ROA.574. The court thus did not abuse its discretion in denying a preliminary injunction.

## Standard of Review

This Court reviews "the denial of a preliminary injunction for abuse of discretion." *Siders v. City of Brandon*, 123 F.4th 293, 300 (5th Cir. 2024). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Id.* (quoting *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam)).

# Argument

The district court correctly denied Plaintiffs' motion for preliminary injunction. To obtain a preliminary injunction, the applicants must show:

> (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest.

*Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (citation omitted). The third and fourth requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court "has repeatedly cautioned that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Steen*, 732 F.3d at 386 (internal quotation marks omitted).

Plaintiffs did not "clearly carr[y]" their burden of persuasion on all four requirements. Although the district court was not required to address whether Plaintiffs were likely to succeed on the merits of their dormant Commerce Clause claim, the record demonstrates that Plaintiffs are not likely to succeed on that claim. The district court also correctly dismissed Upside's PPIA preemption claim, necessarily finding that it was not likely to succeed on that claim either. Finally, Plaintiffs failed to show both that they were irreparably harmed by S.B. 261 and that the balance of the equities favored them.

## I. The District Court Was Not Required to Consider Likelihood of Success on the Merits

The district court denied Plaintiffs' request for a preliminary injunction because they did not show that all four of the requirements for a preliminary injunction were met. Plaintiffs begin by arguing that reversal is warranted because the district court did not address whether Plaintiffs were likely to succeed on the merits of their dormant Commerce Clause claim. Blue Br. at 16. For three reasons, they are wrong.

*First*, if a plaintiff fails to establish any of the four preliminary-injunction requirements, the district court may not grant a preliminary injunction. To obtain a preliminary injunction, the plaintiff must carry its burden of persuasion on *all* four requirements. *Steen*, 732 F.3d at 386. This Court thus "affirms the denial of a preliminary injunction if 'the movant has failed sufficiently to establish *any one* of the four criteria.'" *Anibowei v. Morgan*, 70 F.4th 898, 905 (5th Cir. 2023) (quoting *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990)). As explained in Section IV, *infra*, the district court correctly found that Plaintiffs did not carry their burden of persuasion on either irreparable harm or the balance of the equities. As a result, they were not entitled to a preliminary injunction.

*Second*, the district court was not required to address likelihood of success merely because Plaintiffs brought "constitutional claims." This Court has affirmed denials of a preliminary injunction without addressing likelihood of success in cases involving constitutional claims. For example, it did so in *Defense Distributed v. U.S. Department of State*, in which the plaintiffs alleged violations of the First, Second,

and Fifth Amendments. 838 F.3d 451, 460 (5th Cir. 2016). The district court's decision to take the same approach here was therefore well within its discretion.

Plaintiffs contend (at 17) that the district court was required to address the merits because "in a federal constitutional case, the equities are intertwined with the merits." In making this argument, they point to cases in which the Supreme Court and this Court applied a presumption of irreparable harm in cases involving constitutional claims. However, none of these cases involved the dormant Commerce Clause or any other clause of Article I. *See Mirabelli v. Bonta*, 607 U.S. 492, 493 (2026) (per curiam) (Free Exercise Clause and the Fourteenth Amendment's Due Process Clause); *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (Free Speech Clause); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 & n.21 (5th Cir. 2021) (Due Process Clause and Free Exercise Clause); *Space Expl. Techs. Corp. v. Nat'l Lab. Rel. Bd.*, 151 F.4th 761, 778 (5th Cir. 2025) (Article II). Given that the practice of presuming irreparable harm is already questionable, *see* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 Harv. J.L. & Pub. Pol'y 743, 745 (2012), this Court should exercise caution in extending it to new constitutional provisions.

That caution is warranted here, as it makes little sense to presume irreparable harm in cases involving claims under the dormant Commerce Clause. Unlike other constitutional claims, the harm for dormant Commerce Clause claims is necessarily economic in nature. *See Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 654 (1994) (explaining that injuries under the dormant Commerce Clause "[are] measured in dollars and cents, not legal abstractions"). Thus, if (as here) the district court finds

that the plaintiffs have not suffered irreparable economic harm or that the public interest outweighs such harm, that should end the inquiry.

*Third*, even if the district court was required to address the merits, this Court may still affirm the district court's decision because Plaintiffs failed to establish a likelihood of success on the merits of their dormant Commerce Clause claim. "This Court may affirm on grounds other than those relied upon by the district court when the record contains an adequate and independent basis for that result." *Lauren C. by & through Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 374 (5th Cir. 2018) (citation omitted). The record is more than sufficient to show that Plaintiffs cannot succeed on their dormant Commerce Clause claim. This Court may therefore affirm the district court on that alternative ground.

## II. Plaintiffs Are Not Likely to Succeed on Their Dormant Commerce Clause Claim

Exercising its "historic police powers," *AbbVie, Inc. v. Murrill*, 166 F.4th 528, 539 (5th Cir. 2026), the Texas Legislature decided to prohibit the sale of cultivated meat in Texas for two years. Plaintiffs, two California-based cultivated meat companies with almost no history of sales in Texas, allege that S.B. 261 violates the dormant Commerce Clause. Because S.B. 261 is facially neutral and does not discriminate against interstate commerce in either purpose or effect, their dormant Commerce Clause claim is not likely to succeed on the merits.

A state statute "violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co.*, 495 F.3d at 160. The plaintiffs bear the burden of showing that the law is

discriminatory in one of these ways. *Id.* If they carry that burden, the burden then shifts to the State to show "the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U.S. at 138.

The Supreme Court has "expressly cautioned against judges using the dormant Commerce Clause as 'a roving license for federal courts to decide what activities are appropriate for state and local government to undertake.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 380 (2023) (plurality op.) (citation omitted). The State "retains broad regulatory authority to protect the health and safety of its citizens." *Taylor*, 477 U.S. at 151. This authority is "particularly strong when the State acts to protect its citizenry in matters pertaining to the sale of foodstuffs." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977). In the absence of discrimination against interstate commerce, "'a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." *Nat'l Pork Producers*, 598 U.S. at 369 (citation omitted).

### A. S.B. 261 was not enacted with a discriminatory purpose.

Plaintiffs concede that S.B. 261 is facially neutral. To succeed on their dormant Commerce Clause claim, they must therefore prove that S.B. 261 has a discriminatory purpose or effect. Pointing to a few remarks from state legislators about traditional agriculture, Plaintiffs first claim that S.B. 261 "was enacted with a discriminatory purpose to benefit in-state agricultural businesses at the expense of out-of-state competition." ROA.30–37, 46. However, these stray remarks are

outnumbered by remarks about the risks of consuming cultivated meat, and they are insufficient to make S.B. 261 unconstitutional. And even if Plaintiffs could show that S.B. 261's purpose is discriminatory, their claim would still fail because they cannot show that the law has a discriminatory effect.

### 1. S.B. 261's purpose is to protect Texans' health.

This Court considers the *Arlington Heights* factors to determine whether a "state legislature's actions amount to purposeful discrimination against interstate commerce":

> (1) whether the effect of the state action creates a clear pattern of discrimination; (2) the historical background of the action, which may include any history of discrimination by the decisionmakers; (3) the "specific sequence of events leading up" to the challenged state action, including (4) any "departures from normal procedures[;]" and (5) "the legislative or administrative history of the state action, including contemporary statements by decisionmakers."

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019) (quoting *Allstate Ins. Co.*, 495 F.3d at 160). "Legislators' awareness of a discriminatory effect 'is not enough: the law must be passed because of' that discriminatory effect." *Id.* (quoting *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016)). "The challenger must show that the discriminatory effect was 'a substantial or motivating factor' leading to the enactment of the statute." *Id.* (quoting *Veasey*, 830 F.3d at 231).

In *Maine v. Taylor*, the Supreme Court recognized that protecting citizens from "imperfectly understood" health risks is a legitimate purpose of legislation. 477 U.S. at 148. The Court has also held that the legitimate purposes behind a bill may "be

weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant Commerce Clause are present." *Tracy*, 519 U.S. at 307. And in considering such purposes, the "good faith of [the] state legislature must be presumed." *See Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citation omitted).

In their opening brief, Plaintiffs invoke only the fifth *Arlington Heights* factor (legislative history) and spend one paragraph arguing that S.B. 261 has a discriminatory purpose. Blue Br. at 22. Parsing legislative history is inherently problematic, but in this case the legislative history shows the purpose of S.B. 261 is not to discriminate against out-of-state interests.

Instead, the purpose of S.B. 261 is to protect Texas residents against the imperfectly understood risks of consuming cultivated meat. As set out above, legislators repeatedly identified this purpose in the debates and hearings on S.B. 261. For example, Representative Gerdes said that S.B. 261 was designed to prevent Texans from becoming a "scientific experiment" and that his job was "to protect the folks of Texas and make sure that if things are coming to market, . . . there are safeguards in place in place to make sure it's safe for human consumption." First House Floor Debate at 7:46:00–14. Representative Schofield said he supported the bill because cultivated meat is a new, insufficiently tested product: "We're talking about something we're creating that didn't exist before, and we're talking about feeding it to people." House Committee Hearing at 4:45:00–13. And Senator Perry explained that the two-year ban on cultivated meat would "give science and industry

groups" time to "do the vetting process they need to do." Amend. Proposal to Tex. S.B. 261 on the Floor of the Tex. S., 89th Leg., R.S., at 3:19:00–11 (May 12, 2025).[8]

That a few legislators also expressed support for traditional agriculture does not make S.B. 261 discriminatory. This Court has held that "stray protectionist remarks of certain legislators are insufficient to condemn [a] statute" under the dormant Commerce Clause. *Allstate Ins. Co.*, 495 F.3d at 161. Thus, in *Allstate*, the Court upheld a statute that restricted auto-insurance companies from owning and operating auto body shops in Texas even though more than one legislator made protectionist remarks in support of the statute. 495 F.3d 151. As the Court explained, one legislator "prominently highlighted local industry concerns" during a legislative hearing and another "commented on the issue of competition with local industry." *Id.* at 156 n.4 (also excerpting remarks). However, at least one other legislator focused on consumer protection, *see id.*, and the legislative record "reveal[ed] that the Legislature heard extensive testimony from various witnesses on the legitimate consumer protection concerns sought to be remedied by" the statute, *id.* at 161. The Court concluded that this testimony "provided a more than adequate and legitimate basis for the Legislature's decision to adopt the proposed regulations and undercuts Allstate's contention that the enactment of the overall statutory scheme was driven by a discriminatory purpose." *Id.*

As in *Allstate*, members of both the House and Senate heard testimony on the imperfectly understood risks of consuming cultivated meat, which they reiterated in

[8] Available at https://senate.texas.gov/videoplayer.php?vid=22110&lang=en.

their own remarks. This testimony provided a legitimate basis for enacting S.B. 261 and undercuts Plaintiffs' contention that S.B. 261 was enacted with a discriminatory purpose.

**2. S.B. 261 treats in-state and out-of-state companies the same.**

The fact that S.B. 261 bans *all* companies from selling cultivated meat, regardless of where they are located, also undercuts Plaintiffs' discriminatory-purpose claim. The Supreme Court has held that a statute that "treat[s] all private companies exactly the same" does not discriminate against interstate commerce. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007).

This Court has rejected discriminatory-purpose claims on similar grounds. For example, in upholding a statute that prohibited the sale of horsemeat in Texas, the Court observed that the statute "treats both intrastate and interstate trade of horsemeat equally by way of a blanket prohibition. In no way could the prohibition be considered economic protectionism." *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007). Similarly, in upholding a statute that prohibited public corporations from obtaining a specific liquor permit, the Court observed: "The ban's effect on *all* public corporations provides strong evidence that the Legislature did not purposefully discriminate against out-of-state corporations." *Wal-Mart*, 945 F.3d at 218 (emphasis in original).

Like the statutes in *Empacadora* and *Wal-Mart*, S.B. 261 bans *all* cultivated meat companies from selling their product in Texas. In fact, it threatens to put an in-state cultivated meat company "out of business." As set out above, the CEO of an Austin-based cultivated meat company testified against S.B. 261 at both committee hearings.

Although her company is not yet authorized to sell its product, she highlighted her ties to Texas and urged the committee, "Please do not put me, a life-long Texan, out of business." House Committee Hearing at 5:03:00–03. Her testimony makes Plaintiffs' claim that S.B. 261 is designed to discriminate against an out-of-state industry implausible. *See Empacadora*, 476 F.3d at 335 (noting that two Texas slaughterhouses had challenged the horsemeat ban).

Nor does it matter that all companies currently authorized to *sell* cultivated meat are based out of state. "That all or most affected businesses are located out-of-state does not tend to prove that a statute is discriminatory." *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 726 (5th Cir. 2004); *see also Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (similar).

**3. A discriminatory purpose is not dispositive.**

Even if this Court were to conclude that S.B. 261 has a discriminatory purpose, Plaintiffs' claim would still fail because they cannot prove that the law has a discriminatory effect. As the Supreme Court has observed, "The Commerce Clause regulates effects, not motives." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015); *see also Wal-Mart*, 945 F.3d at 214 (explaining that, for a law's purpose to be discriminatory, it must be passed "because of" the discriminatory effect it has on interstate commerce). It is therefore "difficult to conceive of a case in which a [statute] that does not discriminate in effect could be struck down based on discriminatory purpose." *See Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 89 (1st Cir. 2021).

It must be the case that a law that has a discriminatory purpose but fails to accomplish that purpose in effect is non-discriminatory. Otherwise, there would be no causal link between the law and the interstate commerce that the dormant Commerce Clause is designed to protect. In fact, a law is by definition not discriminatory if it does not discriminate in effect, because it does not treat in-state and out-of-state economic interests differently. *See Or. Waste Sys., Inc. v. Dep't of Env't. Quality of State of Or.*, 511 U.S. 93, 99 (1994) ("'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.").

For the reasons described below, S.B. 261 does not discriminate against interstate commerce in effect. Thus, even if it had a discriminatory purpose, S.B. 261 does not violate the dormant Commerce Clause.

### B. S.B. 261 does not have a discriminatory effect on interstate commerce.

In addition to not having a discriminatory purpose, S.B. 261 does not have a discriminatory effect on interstate commerce. Cultivated meat is not similarly situated to traditional meat, as would be required to show a discriminatory effect, and any effect S.B. 261 has on the interstate market for meat is *de minimis*.

#### 1. Cultivated meat is not similarly situated to traditional meat.

"Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Tracy*, 519 U.S. at 298 (footnote omitted). "[W]hen the allegedly competing entities provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for

constitutional purposes." *Id.* at 299. A statute thus has a discriminatory effect only if it provides a "competitive advantage to in-state interests vis-à-vis *similarly situated* out-of-state interests." *Wal-Mart*, 945 F.3d at 219 (emphasis in original) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 501 (5th Cir. 2001)). "Although competing in different markets or offering different products generally means that entities are not similarly situated, competing in the same market is not sufficient to conclude that entities are similarly situated, as *Tracy* made clear." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009) (citing *Tracy*, 519 U.S. at 299).

For four reasons, cultivated meat is not similarly situated to traditional meat. *First*, it is produced by an entirely different, lab-based process that does not involve animal slaughter. *See* ROA.359. Because of its different production process, cultivated meat is a "different product[]" from traditional meat. *See Nat'l Ass'n of Optometrists*, 567 F.3d at 527. This fact weighs against a conclusion that cultivated meat and traditional meat are similarly situated, regardless of whether they compete in the same market. *Id.*

*Second*, cultivated meat does not compete with traditional meat, nor is it likely to anytime soon. The CEO of Upside acknowledged this in his testimony against H.B. 1431. He explained that, because of the cost of production, cultivated meat is functionally a delicacy, and the industry is "not a threat to anyone right now." *See* House Committee Hearing at 5:19:14–17. This fact should be dispositive. "[I]n the absence of actual or prospective competition between the supposedly favored and

disfavored entities in a single market there can be no local preference" and thus no discriminatory effect. *Tracy*, 519 U.S. at 300.

That cultivated meat might, one day, compete with traditional meat is not enough. Plaintiffs have "the burden of showing discriminatory effects, not merely illustrating that discriminatory effects could plausibly exist." *Churchill Downs Inc. v. Trout*, 589 F. App'x 233, 237 (5th Cir. 2014). The Supreme Court has "never deemed a hypothetical possibility of favoritism to constitute discrimination that transgresses constitutional commands." *Associated Indus. of Mo.*, 511 U.S. at 654.

*Third*, cultivated meat and traditional meat appeal to different consumers. Wildtype and Upside acknowledge that their products appeal to people who oppose eating traditional meat for ethical or environmental reasons, such as vegans or vegetarians. *See* ROA.320–22, 358, 360. Witnesses who testified in favor of S.B. 261 agreed that cultivated meat and traditional meat are likely to have different consumer bases. *See, e.g.*, House Committee Hearing at 4:34:00–06 ("[A] lot of people that are going to eat this product are not going to eat mine."). Because they have different consumer bases, cultivated meat and traditional meat "serve different markets" and are not similarly situated. *See Tracy*, 519 U.S. at 299.

*Fourth*, the two companies in this case make cultivated chicken and cultivated salmon, not cultivated beef, and Plaintiffs have not shown that their products compete with the product S.B. 261 is supposedly designed to protect (traditional beef). In the affidavits they attached to their motion for preliminary injunction, Plaintiffs conclusorily assert that their products "serve[] as a substitute for, and compete[] with, conventional meat." ROA.322, 361. Yet, for support, they do little

more than speculate that a consumer of traditional salmon might choose to try cultivated salmon instead, ROA.322 (Wildtype), or that a consumer of traditional chicken might "purchase less [traditional] chicken if given the opportunity to try and purchase UPSIDE's cultivated chicken," ROA.361 (Upside); *see also* ROA.39. They do *nothing* to show that a consumer of Texas beef would give up beef for a (more expensive) cultivated salmon or chicken product. As a result, Plaintiffs have failed to show that "in-state interests" have been given a "competitive advantage . . . vis-à-vis *similarly situated* out-of-state interests." *Wal-Mart*, 945 F.3d at 219.

Plaintiffs (at 25) counter that the dormant Commerce Clause does not require the products to be "identical," which is true, but it does require the products to be similarly situated, and Plaintiffs fall short of that requirement. Plaintiffs also point to *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984), where the Supreme Court observed that "as long as there is some competition between the locally produced exempt products and non-exempt products from outside the State, there is a discriminatory effect." *Id.* at 271. Unlike this case, however, *Bacchus* involved a facially discriminatory liquor tax exemption, the purpose of which was undisputedly "to aid Hawaiian industry." *Id.* Its holding on competition was also limited to the "stipulated facts in this case." *Id.* at 269. And the case was decided before *Tracy*, 519 U.S. at 299–300, where the Supreme Court gave a more detailed exposition of the similarly situated requirement. *Bacchus* thus has no application here.

**2. S.B. 261's effect on interstate commerce is *de minimis*.**

Even if cultivated meat and traditional meat are similarly situated, S.B. 261's effect on interstate commerce is *de minimis*. "A party challenging a facially neutral

statute under the dormant Commerce Clause must prove that the statute has a substantial (i.e., beyond *de minimis*) competitive effect on nonstate interests." *Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27, 39 (1st Cir. 2024) (citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978)).

S.B. 261's effect on the interstate market for meat is *de minimis*. In 2025, the global market for cultivated meat was estimated at $0.27 billion, compared to $25 billion in chicken nuggets and sandwich sales at McDonald's alone. ROA.436. Cultivated meat's share of the overall market for meat in the United States is therefore negligible. Nor is there a meaningful market for cultivated meat in Texas. Since receiving no-questions letters from the FDA, Upside has sold its cultivated chicken to one Texas resident (in 2024), and Wildtype has made its salmon available at one restaurant. ROA.324, 363. By banning such insubstantial commerce from taking place in one State for two years, S.B. 261's effect on the interstate market for meat is *de minimis*.

### C. In any case, S.B. 261 passes heightened scrutiny.

If this Court were to determine that S.B. 261 has a discriminatory purpose and effect, then the next step would be to subject the statute to heightened scrutiny. A state law that discriminates against interstate commerce is invalid unless the State shows that "the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U.S. at 138. S.B. 261 passes this heightened scrutiny. It serves a legitimate purpose of protecting Texans from the imperfectly understood risks of consuming cultivated

meat, and no nondiscriminatory alternatives could adequately accomplish this purpose.

In debates and hearings, members of the Texas Legislature repeatedly stated that the purpose of S.B. 261 was to protect Texans from the unknown risks of consuming cultivated meat. *E.g.*, First House Floor Debate at 7:46:00–14. Committees in each chamber also heard testimony that highlighted not only the unknown, long-term effects of consuming cultivated meat but also existing studies showing that the product may be harmful to consumers. *E.g.*, Senate Committee Hearing at 3:17:45–3:18:38; House Committee Hearing at 4:23:28–4:51:38. The Texas Legislature thus decided to enact a two-year ban on the sale of cultivated meat to give the Legislature time to consider an appropriate response to the new, potentially harmful product.

As explained above, the Supreme Court has recognized that a State has a legitimate interest in "protect[ing] the health and safety of its citizens," including against "imperfectly understood" risks. *Taylor*, 477 U.S. at 148, 151. In *Taylor*, the Supreme Court upheld a facially discriminatory law that prohibited the import of live baitfish into Maine. In doing so, the Court wrote that Maine has a "legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible." *Id.* at 148. It agreed with the district court that the dormant Commerce Clause does not require the State to "sit idly by and wait until potentially irreversible environmental damage has occurred or until the scientific community agrees on what disease organisms are or

are not dangerous." *Id.* at 148 (citation omitted). Neither does the dormant Commerce Clause require the Texas Legislature to sit idly by here.

Plaintiffs argue (at 24) that the State Defendants were required to "produce concrete evidence that" S.B. 261 promotes health and safety, but *Taylor* suggests otherwise. The very absence of evidence is the issue with cultivated meat, as witnesses repeatedly testified during the legislative hearings. The fact that one witness answered a question about the health risks of cultivated meat by stating, "Personally, I don't have any information on that," House Committee Hearing at 4:22:26–40, therefore underscores the need for the ban, if it is relevant at all. And, although the absence of evidence is the principal problem, other witnesses *did* highlight studies showing that cultivated meat is unsafe to consume. *See, e.g.*, Senate Committee Hearing at 3:18:10–38.

In any event, the cases Plaintiffs cite for the proposition that "concrete evidence" is required are inapplicable. Each of these cases recites the standard for "evaluating a discriminatory *alcohol-related* regulation," *Wal-Mart*, 945 F.3d at 213 (emphasis added), such as a two-year residency requirement for obtaining a liquor license, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 540 (2019), where the health benefits are dubious. Because S.B. 261 is not an alcohol-related regulation, "concrete evidence" was not required.

Plaintiffs also miss the mark in arguing (at 25) that S.B. 261 is underinclusive in advancing its health-and-safety goals. This argument misconstrues the purpose of S.B. 261. By banning the sale (and not the manufacture or possession) of cultivated meat for two years, S.B. 261 protects consumers while permitting universities and

other organizations to study and develop the product. And even if S.B. 261 were underinclusive, that would not make it unconstitutional: "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015).

Finally, S.B. 261 was the least restrictive way for the Legislature to address the imperfectly understood risks of consuming cultivated meat. Ordinary food-safety laws would not adequately accomplish the Legislature's purpose, nor would "requir[ing] accurate labeling or disclosures[] or study[ing] the products." *Contra* Blue Br. at 25. Cultivated meat is not like "raw shellfish and undercooked animal products," to which state law applies a mere disclosure requirement. *Contra id.* at 26. The risks of consuming those products are well understood, and they are generally regarded as safe to eat. The same is not true of cultivated meat. Whether it is safe to eat in the long run is unknown. Given the uncertainty, a temporary ban was the only option that adequately served the State's interest.

* * *

The district court's decision to deny the preliminary injunction was thus correct and may be affirmed for the alternative reason that Plaintiffs failed to show a likelihood of success on their dormant Commerce Clause claim.

## III. Upside Is Not Likely to Succeed on Its Preemption Claim

Upside's second claim is that the PPIA expressly preempts S.B. 261. Blue Br. at 43–56. The district court correctly dismissed this claim, finding that neither the facilities provision nor the ingredients provision of the PPIA prevents the State from enacting an outright ban on the sale of a poultry product. ROA.571–73.

Generally, preemption analysis proceeds "with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This type of "analysis is classic 'tie goes to the state' jurisprudence, and the existence of an express preemption provision does not always plainly demarcate what the federal law expressly preempts." *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005).

The PPIA empowers the Secretary of Agriculture to establish uniform federal standards for poultry products. 21 U.S.C. §§ 451, 455–57. It also empowers the Secretary to inspect and prevent these products from being "adulterated or misbranded." *Id.* § 452.[9]

Relevant here, the PPIA contains two express preemption provisions. The facilities provision preempts state laws with additional or different requirements "with respect to premises, facilities and operations of any official establishment[.]" *Id.* § 467e. The ingredients provision preempts state laws that require additional or different "ingredient requirements . . . with respect to articles prepared at any official establishment[.]" *Id.* A companion statute that governs meat products, the Federal Meat Inspection Act (FMIA), *see id.* § 603(a), contains nearly identical facilities and ingredients provisions, *id.* § 678.

In arguing that the PPIA preempts S.B. 261, Upside raises the same arguments that it raised in a lawsuit against Florida's cultivated meat ban, S.B. 1084. The

[9] Texas agrees that Upside is an "official establishment" and thus subject to the PPIA. 21 U.S.C. § 453(p). And for the purposes of this appeal, Texas does not dispute that Upside's lab-grown chicken is a "poultry product." *Id.* §§ 453(e)–(f).

Eleventh Circuit recently rejected those arguments in *Upside Foods Inc v. Commissioner, Florida Department of Agriculture & Consumer Services* 171 F.4th 1239 (11th Cir. 2026). The court held that the plaintiffs were unlikely to succeed on the merits of their claim that either the facilities provision or the ingredients provision preempts S.B. 1084. *Id.* at 1254–57. Accordingly, the court affirmed the denial of Upside's motion for preliminary injunction. This Court should do the same.

### A. The PPIA's facilities provision does not preempt S.B. 261.

The facilities provision preempts state laws that impose different or additional requirements "with respect to premises, facilities and operations of any official establishment." 21 U.S.C. § 467e. In contrast, S.B. 261 states that "[t]he offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited." Tex. Health & Safety Code § 431.02105(a). Because S.B. 261's ban on the sale of cell-cultured protein does not affect the premises, facilities, or operations of any official establishment, it is not preempted by the facilities provision.

#### 1. The text of the facilities provision does not preempt a sales ban of an end product.

"Absent a reason to think otherwise, we interpret statutory terms according to the ordinary meanings they had when they were enacted." *U.S. Postal Serv. v. Konan*, 607 U.S. 391, 399 (2026). Because the PPIA does not define the words "premises, facilities, and operations," courts consider the ordinary meaning of those words. And each word refers to activities at a physical place, not to offsite sales of an end product.

As the Eleventh Circuit reasoned in *Upside*, "'premises' and 'facilities' refer to the site of poultry slaughtering or processing." 171 F.4th at 1254. For each operative term, the court cited dictionary definitions covering the late 1950s when the PPIA was enacted. *Id.* One dictionary defined "premises" as "a specified piece or tract of land with the structures on it" or "the place of business of an enterprise or institution." *Webster's Third New International Dictionary* 1789 (1st ed. 1961). That dictionary also defined "facilities" as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." *Id.* at 812–13.

And while the word "operations" could have a broader meaning and include offsite conduct, it should be understood more narrowly in this context. *Upside*, 171 F.4th at 1254. "[O]perations" is defined as "the whole process of planning for and operating a business or other organized unit." *Webster's*, *supra* at 1581. Under the contextual canon *noscitur a sociis*, however, associated nouns should be assigned meanings that make them similar to one another. *Upside*, 171 F.4th at 1254 (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012)). Because "operations" resides alongside "premises" and "facilities," it should be understood to share the physical connotation that unites the three words.

Indeed, these "premises, facilities and operations" are "of any official establishment," which confirms that all three terms have a physical connotation. *See id.* (explaining that these terms refer to "the land and structures of an establishment that slaughters poultry or processes poultry products"). The PPIA defines an "official establishment" as an establishment "at which inspection of the slaughter

of poultry, or the processing of poultry products" occurs, 21 U.S.C. § 453(p), so the phrase "of any official establishment" following the listed nouns should be understood to limit "operations" to *onsite* operations, *Upside*, 171 F.4th at 1254. Since S.B. 261's ban on the end product of cultivated chicken does not affect the operations of a physical facility, it is not preempted.

The apparent breadth of the phrase "with respect to" does not alter this conclusion. "That phrase 'generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'" *See Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, at *7 (U.S. June 25, 2026) (quoting *Patel v. Garland*, 596 U.S. 328, 339 (2022)). But the meaning of a given statutory phrase depends on context, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011), and the meaning of "with respect to" here requires a "direct relationship to the premises, facilities, and onsite operations of a poultry processor," *Upside*, 171 F.4th at 1254; *cf. Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 720 (2018) ("[A] statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status."). Otherwise, an expansive version would make the list of nouns preceding that phrase "largely redundant," in violation of the surplusage canon. *Upside*, 171 F.4th at 1255 (citing Scalia & Garner, *supra*, at 174). A direct effect on the premises, facilities, or operations is thus required, and S.B. 261's sales ban does not directly affect any of these three.

The PPIA's savings clause supports this view. It uses "with respect to" as well, stating that "[t]his chapter shall not preclude any State . . . from making requirement

or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." 21 U.S.C. § 467e. Like Florida's ban, S.B. 261's "ban covers lab-grown chicken, not how lab-grown chicken is created or processed." *Upside*, 171 F.4th at 1255. If "with respect to" included downstream effects, then the savings clause would not save anything, as "[a]ny state law respecting other matters that the PPIA regulates could have an incidental or indirect effect on premises, facilities, or operations." *Id.* Because there is no "direct relationship" between the product ban and the premises, facilities, or operations of an onsite facility, S.B. 261 is not preempted by the facilities provision. *See id.*

**2. Precedent confirms that the facilities provision does not preempt a sales ban of an end product.**

This Court's decision in *Empacadora*, 476 F.3d 326, confirms that the facilities provision does not preempt S.B. 261. Like the PPIA, the FMIA preempts requirements "with respect to premises, facilities and operations of any establishment at which inspection is provided . . . which are in addition to, or different than those made under this chapter." 21 U.S.C. § 678. In *Empacadora*, the Court determined that Texas's ban on the sale of horsemeat was not preempted by the FMIA because, while the "preemption clause expressly limits states in their ability to govern meat inspection and labeling requirements," that clause "in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place." 476 F.3d at 333.

Critically, the Court rejected the argument that "[p]reventing slaughterhouses . . . from selling or possessing horsemeat for human consumption . . . is an attempt

by Texas to regulate the premises, facilities and operations of [the] slaughterhouses." *Id.* Instead, "the FMIA's preemption clause is more naturally read as being concerned with the methods, standards of quality, and packaging that slaughterhouses use." *Id.*

The Seventh Circuit reached the same conclusion in *Cavel International, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007), which involved Illinois's horsemeat ban. It observed that whenever "horse meat is produced for human consumption, its production must comply with [the FMIA]. But if it is not produced, there is nothing, so far as horse meat is concerned, for the [FMIA] to work upon." *Id.* The court also found "untenable" a "literal" reading of the FMIA's facilities provision, under which "a state law that shuts down any 'premises, facilities and operations of any establishment at which inspection is provided' is 'different' from the federal requirements for such premises." *Id.*

Just as the Texas and Illinois legislatures in *Empacadora* and *Cavel* could ban horsemeat without running afoul of the FMIA's facilities provision, the Texas Legislature can ban cultivated meat (including chicken) without running afoul of the PPIA's facilities provision. As the Eleventh Circuit held in *Upside*, "PPIA's regulation of lab-grown chicken does not obligate states to permit the manufacture or sale of lab-grown chicken—it obligates states not to impose additional or different regulations on such manufacture or sale if it is permitted." 171 F.4th at 1255–56.

This Court's recent decision in *Williams v. Wingrove* also confirms that the facilities provision does not preempt S.B. 261. In *Williams*, the plaintiffs asserted state-law negligence claims in which they alleged that the defendant employer had

failed to protect the employees of a meatpacking plan from COVID-19, resulting in one employee's death from the disease. 153 F.4th at 459. The defendant argued that Plaintiffs' negligence claims were preempted by the PPIA's facilities provision. *Id.* at 462.

The Court held that the claims were not preempted. It first considered Congress's policy declaration for the PPIA, which is "to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles . . . to prevent the movement or sale in interstate or foreign commerce of . . . poultry products which are adulterated or misbranded." *Id.* at 463 (quoting 21 U.S.C. § 452). From there, the Court determined that "domain of the PPIA is food safety as well as any behavior that would cause 'adulteration of product.'" *Id.* But the defendant made "no argument that there is a connection between the duty to prevent the spread of COVID-19 and food product safety." *Id.* at 464. Its failure to make that connection was "fatal." *Id.*

*Williams* requires the same outcome here. As the district court held, "[c]omplete sales bans do not alter whether food *being sold* is less safe than the PPIA would require, and a complete sales ban has nothing to do with adulterating chicken products." ROA.573 (emphasis added). The facilities provision thus does not preempt S.B. 261.

### 3. Upside's arguments to the contrary are unpersuasive.

Upside contends (at 51–52) that the facilities provision preempts S.B. 261 because "[e]ven though the federal government has concluded that Upside's process, facility, and product are both lawful and safe, SB 261 imposes a different

requirement." For support, Upside relies on *National Meat Association v. Harris*, 565 U.S. 452 (2012), which is distinguishable from this case.

In *National Meat*, the Supreme Court held that the FMIA's facilities provision preempted a California law governing the treatment of nonambulatory animals,[10] including swine. *Id.* at 464. The statute prohibited slaughterhouses from buying or selling nonambulatory animals, from processing or selling products derived from nonambulatory animals for human consumption, and from holding nonambulatory animals without immediately euthanizing them. *Id.* at 458–59 (quoting Cal. Penal Code § 599f (2010)). The Court held that the FMIA preempted application of this statute against federally regulated swine slaughterhouses because "[i]t compels them to deal with nonambulatory pigs on their premises in ways that the federal Act and regulations do not." *Id.* at 460. As to the provision banning the sale of products derived from nonambulatory animals, the Court held that, even though the facilities provision ordinarily would not preempt a ban on the sales of an end product, it did preempt California's ban in that case because the ban was "calculated to help implement and enforce each of the section's other regulations—its prohibition of receipt and purchase, its bar on butchering and processing, and its mandate of immediate euthanasia." *Id.* 463–64.

As the Eleventh Circuit explained in *Upside*, the California law in *National Meat* is "meaningfully different than the . . . law in this" case. 171 F.4th at 1256. "The key difference here is that the California swine-processing law permitted an end

[10] Nonambulatory animals are animals that cannot walk.

product—pork—but told facilities how to handle or process that product if the pigs were nonambulatory. By contrast, [S.B. 261] bans an end product—lab-grown chicken—and doesn't tell facilities how to handle or process that product." *Id*. *National Meat* is therefore distinguishable, and Upside's argument that S.B. 261 is preempted because "Texas law says the resulting product may not be sold because it was produced by th[e] operation" of cell-cultivation falls flat. *See* Blue Br. at 53.

### B. The PPIA's ingredients provision does not preempt S.B. 261.

The PPIA's ingredients provision preempts state laws that require additional or different "ingredient requirements . . . with respect to articles prepared at any official establishment." 21 U.S.C. § 467e. Because S.B. 261 bans an end product, not an ingredient, it is not preempted under this provision either.

The PPIA does not define the phrase "ingredient requirement," so courts consider that phrase's ordinary meaning. *Konan*, 607 U.S. at 399. A contemporaneous dictionary defines "ingredient" as "something that enters into a compound or is a component part of any combination or mixture." *Webster's*, *supra* at 1162. And "requirement" is "a requisite or essential condition." *Id.* at 1929. An "ingredient requirement" thus "means a rule establishing an essential component of a mixture or combination." *Upside*, 171 F.4th at 1257. S.B. 261 does not create a component requirement but rather bans the sale of an end product of cultivated chicken. Thus, it is not preempted by the PPIA.

Precedent again confirms this conclusion. As explained above, in *Empacadora* this Court held that Texas's ban on the sale of horsemeat was not preempted by the FMIA because States may "regulate what types of meat may be sold for human

consumption in the first place." 476 F.3d at 333.[11] The Ninth Circuit reached a similar conclusion in *Association des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1150 (9th Cir. 2017).[12] The court held that a California statute that banned the sale of force-fed birds was not preempted by the PPIA because the "PPIA targets the slaughtering, processing, and distribution of poultry products . . . but it does not mandate that particular types of poultry be produced for people to eat." *Id.* The PPIA thus does not "limit[] a state's ability to regulate the *types* of poultry that may be sold for human consumption." *Id.* And that is all S.B. 261 does: it bans the sale of a particular type of poultry, cultivated chicken.

Upside counters that S.B. 261 "imposes an ingredient requirement" because it "prohibits sale" based on the "ingredient" of "chicken cells." Blue Br. at 49–50. That argument is wrong for at least two reasons.

*First*, it is inconsistent with the ordinary meaning of "ingredient." As the Eleventh Circuit reasoned in *Upside*, "[a] recipe book, for example, would never list 'chicken cells' as an ingredient for fried chicken. Rather, it would list items like chicken, milk, flour, seasoning, and oil." 171 F.4th at 1257. And when the PPIA describes ingredients, it does so "at a non-cellular level." *Id.* It prohibits foreign

---

[11] Upside contends that *Empacadora* involved only "the FMIA's facilities clause—not the FMIA's ingredients clause." Blue Br at 53 (citing 467 F.3d at 333). But the Court cited both clauses in its preemption analysis and did not limit its holding to the facilities clause. *Empacadora* should therefore be read as applying to both clauses. *Accord Upside*, 117 F.4th at 1257.

[12] The plaintiff did not raise an express preemption claim, but the court held that the statute "would still not run afoul of the PPIA's preemption clause." *Ass'n des Éleveurs de Canards*, 870 F.3d at 1150.

poultry product imports if the products contain any "dye, chemical, preservative, or ingredient" that would make them harmful to humans. 21 U.S.C. § 466(a). And a product would be misbranded if its label omitted the "common names of optional ingredients (other than spices, flavoring, and coloring)." 21 U.S.C. § 453(h)(7). PPIA regulations also use the term "ingredient" in this way, such as approving poultry product ingredients like citric acid, gelatin, or coloring agents, 9 C.F.R. § 424.21(c), and "never once referring to components on a cellular level," *Upside*, 171 F.4th at 1257.

*Second*, Upside's argument relies on an inapt case from another circuit. Upside argues that the Michigan statute that the Sixth Circuit held was preempted in *Armour & Co. v. Ball*, 468 F.2d 76, 81–82 (6th Cir. 1972), is like Texas's ban on cultivated meat. But the statute in that case prohibited the sale of sausage based on its standards regulating the inclusion of organ meat, poultry products, cereal and soya binders, milk additives, and fat. *Id.* at 81–82. S.B. 261 differs because it bans an end product and does not regulate ingredients. And while "nearly all provisions in the Michigan Law conflict[ed] with the corresponding provisions in the Secretary's regulations," *id.* at 82, Upside identifies no federal requirement that cultivated chicken must be lawful for sale. Because no ingredient of cell-cultivated chicken is being regulated, PPIA's ingredients provision does not preempt S.B. 261. *See Upside*, 171 F.4th at 1257 (distinguishing *Armour & Co.*).

Finally, the Supreme Court's recent decision in *Monsanto Co. v. Durnell*, No. 24-1068, 2026 WL 1825691 (U.S. June 25, 2026), does not alter the preemption analysis. The Court there held that a state law failure-to-warn claim was preempted

by the EPA's extensive regulations under the Federal Insecticide, Fungicide, and Rodenticide Act. It explained that federal regulations require "Monsanto to sell Roundup with the label that EPA approved . . . without a cancer warning," while the state tort claim "would require Monsanto to add a cancer warning to its labels." *Id.* The directly conflicting state law thus imposed an obligation that was "'in addition to' and 'different from' Monsanto's federal-law labeling obligations" *Id.* As demonstrated above, S.B. 261 imposes no such additional or different obligations here. It does not, for example, require cultivated meat companies to use specific equipment in their facilities or to produce cultivated meat in a specific way; it merely bans the sale of cultivated meat. The statute thus is not preempted by the PPIA.

* * *

Because neither the facilities provision nor the ingredients provision preempts S.B. 261, Upside failed to demonstrate a substantial likelihood of success on the merits of its preemption claim.

## IV. Plaintiffs Failed to Establish the Remaining Preliminary-Injunction Factors

The district court denied Plaintiffs' request for preliminary injunction because "Plaintiffs fail[ed] to show irreparable harm" and, "[m]ore importantly," it "would not comport with the balance of equities" to grant injunctive relief. ROA.574–75. The court noted that S.B. 261 has a two-year expiration date, and Plaintiffs are "only newly beginning to transact business in Texas." ROA.574–75. The district court's decision to deny injunctive relief on these grounds was not an abuse of discretion.

The harm Plaintiffs claim to have suffered from S.B. 261 is negligible. Upside sold its cultivated chicken product to a single Texas resident in March 2024, over two years ago, ROA.363, and Wildtype sold its cultivated meat at one sushi restaurant in Austin after S.B. 261 was enacted but before it went into effect. ROA.324. Both Wildtype and Upside also claim to have made sales trips to Texas and to have had conversations with potential customers. ROA.325, 363. However, neither Plaintiff provides a basis to believe these customer contacts will materialize, and "speculative injury is not sufficient" to show irreparable harm. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Nor should this Court presume irreparable harm merely because this case involves "constitutional claims." Such a presumption would be especially inappropriate in the dormant Commerce Clause context, where harms are necessarily economic. *See supra* Section I.

Plaintiffs insist that their purported economic injuries are sufficient because "it is not so much the magnitude but the irreparability that counts." Blue Br. at 32. But even if that is correct, the district court was required to balance any harm to Plaintiffs against the harm to the State and, by extension, the public. *See Nken*, 556 U.S. at 435 (noting that the third and fourth requirements "merge when the Government is the opposing party"). And, in what it considered the "[m]ore important[]" part of its analysis, the district court correctly held that the balance of the equities did not favor Plaintiffs. ROA.574.

The public interest here is weighty. The Texas Legislature enacted S.B. 261 to protect Texans against the imperfectly understood risks of consuming cultivated

meat. As the Supreme Court and this Court have repeatedly acknowledged, protecting citizens against health-and-safety risks is not merely a legitimate purpose of legislation, *Taylor*, 477 U.S. at 151, but also falls within the core of a State's "historic police powers," *AbbVie*, 166 F.4th at 539. More than that, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam).

The interest on the other side is not so weighty. S.B. 261 prevents two companies that have essentially no market in Texas from selling their product in the State for two years.[13] In the district court's view, "enjoining the law from having any effect in Texas, for the sake of allowing two companies who were only newly beginning to transact business in Texas, would not comport with the balance of equities required for preliminary injunctive relief." ROA.574–75. Just as this Court did in *Defense Distributed*, the district court thus found that the public interest outweighed any harm Plaintiffs suffer from S.B. 261. *See* 838 F.3d at 459 ("[T]he public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs–Appellants."). Its decision to deny a preliminary injunction on this basis was not an abuse of discretion. *Id.* at 460.

---

[13] Indeed, Wildtype seems to have entered the market when it did (after S.B. 261 was signed into law, but before it went into effect) merely for the sake of challenging the law.

## Conclusion and Prayer

For these reasons, this Court should affirm the district court's order denying Plaintiffs' motion for preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ D. Bowie Duncan
D. Bowie Duncan
Assistant Solicitor General
Bowie.Duncan@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellees*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,720 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ D. Bowie Duncan
D. Bowie Duncan