**Case No. 26-50181**

In The
# United States Court of Appeals
For The Fifth Circuit

WILD TYPE, INC. D/B/A WILDTYPE AND UPSIDE FOODS, INC.,

*Plaintiffs – Appellants*

*v.*

JENNIFER SHUFORD, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF STATE HEALTH SERVICES; CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS EXECUTIVE COMMISSIONER OF THE TEXAS DEPARTMENT OF HEALTH AND HUMAN SERVICES COMMISSION; KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS, IN HIS OFFICIAL CAPACITY; DELIA GARZA, IN HER OFFICIAL CAPACITY AS THE COUNTY ATTORNEY OF TRAVIS COUNTY,

*Defendants – Appellees*

On appeal from the U.S. District Court for the Western District of Texas,
No. 1:25-cv-1408; Honorable Alan D. Albright, District Judge

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

**INSTITUTE FOR JUSTICE**

Marco Vasquez Jr.
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936

Paul Sherman
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320

*Counsel for Plaintiffs-Appellants*
*Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel for Plaintiffs-Appellants certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this court may evaluate possible disqualification or recusal.

**Defendants-Appellees**

Jennifer A. Shuford, *in her official capacity as* the Commissioner of the Texas Department of State Health Services

Cecile Erwin Young, *in her official capacity as* the Executive Commissioner of the Texas Health and Human Services Commission

Ken Paxton, *in his official capacity as* Attorney General of Texas

Delia Garza, *in her official capacity as* County Attorney of Travis County

**Counsel for Defendants-Appellees**

OFFICE OF THE ATTORNEY GENERAL OF TEXAS

Douglass Bowie Duncan
Christopher John Pavlinec
Munera Al-Fuhaid
Zachary L. Rhines
Brian B. Tung
Ali Thorburn
Grey W. Johnston

TRAVIS COUNTY ATTORNEY'S OFFICE

Elaine Agnes Casas
Susana Naranjo-Padron
Todd A. Clark

**Plaintiffs-Appellants**

Wild Type, Inc. d/b/a Wildtype

UPSIDE Foods, Inc.

**Counsel for Plaintiffs-Appellants**

INSTITUTE FOR JUSTICE

Paul Sherman
Marco Vasquez Jr.
Arif Panju

*/s/ Marco Vasquez Jr.*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......... iii

TABLE OF AUTHORITIES .......... v

ARGUMENT .......... 1

I. The district court erred in denying preliminary relief on the Commerce Clause claim .......... 2

A. The district court's refusal to consider likelihood of success requires reversal .......... 2

1. *Likelihood of success was necessary to evaluate constitutional injury and the equities* .......... 3

2. *Wildtype and UPSIDE are likely to succeed on the merits of their Commerce Clause claim* .......... 6

a. SB 261 is subject to heightened scrutiny because it was enacted to protect an in-state industry from out-of-state competition .......... 7

b. SB 261 fails heightened scrutiny .......... 13

B. Wildtype and UPSIDE independently established irreparable economic harm .......... 16

C. The balance of equities and public interest favor preliminary relief .......... 19

II. UPSIDE is likely to succeed on its PPIA preemption claims ............20

A. SB 261 imposes additional or different requirements concerning UPSIDE's onsite operations and ingredients .................................... 21

B. Texas cannot avoid preemption by characterizing SB 261 as an end-product sales ban ........................................................................ 23

CONCLUSION........................................................................................... 25

CERTIFICATE OF SERVICE.................................................................... 27

CERTIFICATE OF COMPLIANCE...........................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Abbott*,
495 F.3d 151 (5th Cir. 2007) .......... 7, 11, 12, 13

*Armour & Co. v. Ball*,
468 F.2d 76 (6th Cir. 1972) .......... 23

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017) .......... 22, 25

*Ass'n of Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .......... 6, 20

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) .......... 7, 12

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 3, 4

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .......... 3, 4

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .......... 4, 6

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .......... 17, 18

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023) .......... 16, 17, 18

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) .......... 7

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) .......... 14, 19

*Defense Distributed v. U.S. Department of State*,
838 F.3d 451 (5th Cir. 2016) ........ 4, 5, 6

*Defense Distributed v. U.S. Dep't of State*,
865 F.3d 211 (5th Cir. 2017) ........ 5

*FMC Corp. v. Varco Int'l, Inc.*,
677 F.2d 500 (5th Cir. 1982) ........ 18

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
504 U.S. 353 (1992) ........ 14

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024),
*aff'd*, 606 U.S. 461 (2025) ........ 4

*General Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ........ 12, 13

*Kassel v. Consol. Freightways Corp. of Del.*,
450 U.S. 662 (1981) ........ 10, 11, 19

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ........ 18

*Maine v. Taylor*,
477 U.S. 131 (1986) ........ 10, 13, 14, 15

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) ........ 3

*Monsanto Co. v. Durnell*,
No. 24-1068, 2026 WL 1825691 (U.S. June 25, 2026) ........ 24, 25

*Nat'l Broiler Council v. Voss*,
44 F.3d 740 (9th Cir. 1994) ........ 23

*National Meat Association v. Harris*,
565 U.S. 452 (2012) ........ 23, 24, 25

*New Energy Co. of Ind. v. Limbach*,
486 U.S. 269 (1988) .......... 7, 14

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
48 F.4th 306 (5th Cir. 2022) .......... 12

*Or. Waste Sys., Inc. v. Dep't of Env't Quality*,
511 U.S. 93 (1994) .......... 13

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .......... 20

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023) .......... 16

*S.D. Farm Bureau, Inc. v. Hazeltine*,
340 F.3d 583 (8th Cir. 2003) .......... 10, 13

*Space Expl. Techs. Corp. v. NLRB*,
151 F.4th 761 (5th Cir. 2025) .......... 3, 4, 20

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) .......... 14

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) .......... 16, 18

*Turtle Island Foods Inc. v. Shuford*,
818 F. Supp. 3d 846 (W.D. Tex. 2026) .......... 9

*UPSIDE Foods Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
171 F.4th 1239 (11th Cir. 2026) .......... 24

*W. Lynn Creamery, Inc. v. Healy*,
512 U.S. 186 (1994) .......... 9

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) .......... 17, 18

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
945 F.3d 206 (5th Cir. 2019) .......... 11, 14

*Williams v. Wingrove*,
153 F.4th 455 (5th Cir. 2025) ........................................................................ 23

*Young Conservatives of Tex. Found. v. Smatresk*,
73 F.4th 304 (5th Cir. 2023)..........................................................................20

**Codes, Statutes, and Rules**

7 U.S.C.
§ 136v(a) ............................................................................................ 24, 25

21 U.S.C.
§ 467e ........................................................................................... 20, 22, 23

Tex. Health & Safety Code § 431.002(5-a)................................................... 21, 22

**Other Authorities**

Agric., Commissioner Miller Praises Tx. Legis for Putting a Fork in
Lab-Grown Meat (June 26, 2025),
https://texasagriculture.gov/News-
Events/Article/10442/COMMISSIONER-MILLER-PRAISES-
TEXAS-LEGISLATURE-FOR-PUTTING-A-FORK-IN-LAB-
GROWN-M.............................................................................................8

House of Representatives, 89th Legis. Session (May 24, 2025),
https://house.texas.gov/videos/22257 ...........................................................8

House of Representatives, 89th Legis. Session (May 25, 2025),
https://house.texas.gov/videos/22258 ...........................................................8

Senate Rsch. Serv., Bill Analysis (Mar. 25, 2025),
https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00261I.pdf ..................8

Tex. Dep't of Agric., Texas Agriculture Commissioner Sid Miller
Blasts Lab-Grown Meat Ruling (Jan. 21, 2026),
https://texasagriculture.gov/News-Events/News-Events-
Details/Article/10747/Texas-Agriculture-Commissioner-Sid-
Miller-Blasts-Lab-Grown-Meat-Ruling-Texas-Wi ............................................8

## ARGUMENT

This case is a constitutional challenge to Texas SB 261, which bans the sale of cultivated meat. Wildtype and UPSIDE received the federal government's green light to sell cultivated meat after they completed years of regulatory hurdles. Wildtype and UPSIDE then spent considerable time, effort, and resources to develop business in Texas. By all accounts, they were succeeding. Wildtype was selling cultivated salmon at a popular sushi restaurant in Austin. UPSIDE sold and distributed cultivated poultry within Travis County. And both were in discussions with Texas businesses to carry their products. SB 261, however, ended those promising developments. As a result, Wildtype and UPSIDE have suffered ongoing irreparable harm in the form of lost business opportunities, lost access to the national common market, and lost revenue that cannot be recovered because the State Defendants enjoy sovereign immunity from money damages.

To stop this ongoing harm, Wildtype and UPSIDE sought a preliminary injunction, arguing that SB 261 violates the Commerce Clause and is preempted by federal law. The district court's denial of that motion was error.

As explained in Section I, the district court erred in denying preliminary relief on the Commerce Clause claim because it failed to consider likelihood of success, disregarded Wildtype and UPSIDE's unrecoverable economic and intangible busi-

ness harms, and misweighed the equities and public interest. As explained in Section II, the district court also erred in holding that UPSIDE was unlikely to prevail on the merits of its federal preemption claim, because SB 261 imposes additional or different requirements concerning UPSIDE's onsite operations and ingredients. This Court should thus reverse the decision below and remand for further proceedings.

## I. The district court erred in denying preliminary relief on the Commerce Clause claim.

The district court denied preliminary relief on Wildtype and UPSIDE's Commerce Clause claim without analyzing likelihood of success on the merits, based on its conclusion that they had failed to show irreparable harm. But, as explained in Section A, the district court's refusal to consider likelihood of success requires reversal, because that analysis is crucial to correctly evaluating irreparable harm and the equities. Even without that error, as explained in Section B, Wildtype and UPSIDE provided unrebutted evidence of irreparable economic harms. Finally, as explained in Section C, Wildtype and UPSIDE showed that the balance of equities and public interest favor preliminary relief.

### A. The district court's refusal to consider likelihood of success requires reversal.

The district court applied the wrong legal standard when it denied Wildtype and UPSIDE's motion for preliminary injunction. Section 1 explains why likelihood

of success was necessary to evaluate their constitutional injury and the equities. Although this Court need not reach this issue, Section 2 explains why Wildtype and UPSIDE are likely to succeed on the merits of their Commerce Clause claim.

#### 1. *Likelihood of success was necessary to evaluate constitutional injury and the equities.*

In a constitutional case like this one, a district court cannot properly evaluate irreparable harm and the equities without first analyzing likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023). Here, the district court did not. This Court should reverse and remand for the district court to apply the correct standard. *See* Opening Br. at 16–26.[1]

Under this Court's precedent, a likelihood of success on the merits is the "most important" factor. *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 772 (5th Cir. 2025). A ruling on the merits of a constitutional claim, in turn, informs the analysis of the other preliminary injunction factors. *Baird*, 81 F.4th at 1044.

For two reasons, likelihood of success is "usually decisive" when a plaintiff moves for a preliminary injunction on a constitutional claim. *See id.* at 1041. First, a violation of a constitutional right is irreparable harm. *See Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026) (per curiam); *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th

[1] Citations to "Opening Br." and "Resp. Br." refer to page numbers at the bottom of the briefs.

Cir. 2024). Second, "the government suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025); *see Book People*, 91 F.4th at 341; *Space Expl.*, 151 F.4th at 780. Because the merits are inextricably intertwined with the equities, a district court that "skips" likelihood of success in a constitutional case "cannot properly evaluate the other factors." *Baird*, 81 F.4th at 1044.

In response, the State Defendants point to the general rule that a district court can deny a preliminary injunction when a plaintiff does not show one of the preliminary injunction factors. They then urge this Court to affirm because the district court here concluded there is no irreparable harm and that the equities do not favor relief. Resp. Br. at 16, 21. But that argument begs the question. In constitutional cases, both of these factors are inextricably intertwined with the merits. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). As a result, the district court could not correctly analyze irreparable harm or the balance of equities without first considering the merits. *Baird*, 81 F.4th at 1044.

This Circuit's decision in *Defense Distributed v. U.S. Department of State*, 838 F.3d 451 (5th Cir. 2016), cited by Defendants, does not counsel otherwise. In that case, this Court affirmed the denial of a preliminary injunction in a case involving the export of technical data on 3D printed firearms, concluding that the plaintiff had

failed to carry its burden on the balance of harms and the public interest. But *Defense Distributed* involved exceptional circumstances that underscore why it does not control here. As this Court recognized, "[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case." *Id.* at 458 (emphasis in original). But this Court held that, even if Defense Distributed's rights were violated, the government's interest in protecting national security trumped, especially considering that any technical firearms data that Defense Distributed published under the protection of a preliminary injunction could not be removed from the internet if the government later prevailed on the merits. *Id.* at 459–60.

To be sure, the Fifth Circuit affirmed without deciding likelihood of success, even though the district court had discussed the merits as an alternative ground.[2] But the plaintiff nonetheless received many of the benefits it would have if the Court had conducted that analysis. After all, this Court assumed that the plaintiff would suffer irreparable harm to its constitutional rights—harm that could only occur if its rights were violated. At most then, *Defense Distributed* is the rare case in which a govern-

[2] This in itself drew a sharp dissent from Judge Jones. *See Defense Distributed*, 838 F.3d at 463 (Jones, J., dissenting) (arguing that "the district court's balancing of harms went awry" because it did not have "a proper assessment of plaintiff's likelihood of success on the merits," an error that "fatally affected" the analysis of the remaining factors); *see also Defense Distributed v. U.S. Dep't of State*, 865 F.3d 211, 213 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing en banc) ("A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest . . . .").

ment interest of the highest order—national security—may outweigh the temporary loss of constitutional rights.

Certainly, nothing in *Defense Distributed* calls into question the general rule that the denial of a constitutional right causes irreparable harm. Nor is there any merit to the State Defendants' argument that this general rule does not apply to the Commerce Clause. *See* Resp. Br. at 22–23. *BST Holdings* rejects the premise that Commerce Clause injuries are reducible to ordinary economic loss. After concluding that OSHA likely exceeded Congress's Commerce Clause authority, this Court emphasized that the public interest included preserving "our constitutional structure" and interests "not reducible to dollars and cents." 17 F.4th at 616–19; *see also Ass'n of Accessible Meds. v. Ellison*, 140 F.4th 957, 961 & n.2 (8th Cir. 2025) (similar).

Because this Court's precedents show that consideration of likelihood of success on the merits of a constitutional claim is critical to resolving a motion for preliminary injunction, this Court should reverse the decision below and remand with instructions to consider likelihood of success on the merits of the Commerce Clause claim.

#### 2. *Wildtype and UPSIDE are likely to succeed on the merits of their Commerce Clause claim.*

If this Court agrees that the district court erred by failing to consider likelihood of success, it can reverse and remand on that ground alone. *See* Opening Br. at 15–

26. The State Defendants nonetheless urge this Court to reach the merits and affirm. Resp. Br. at 20, 23–37.

It is well established that an appellate court is "a court of review, not of first view." *See Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). Thus, this Court's general practice would be to remand so the district court can analyze likelihood of success in the first instance. But even if this Court considers likelihood of success, there is no basis to affirm the decision below. As explained below, because SB 261 has both the purpose and effect of discriminating against interstate commerce, it is subject to rigorous scrutiny, which it cannot survive.

#### a. SB 261 is subject to heightened scrutiny because it was enacted to protect an in-state industry from out-of-state competition.

Wildtype and UPSIDE are likely to succeed because SB 261 violates the Commerce Clause. The Dormant Commerce Clause prohibits economic protectionism. *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). A state law violates the Dormant Commerce Clause if it discriminates against interstate commerce on "purpose" or in "effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984). SB 261 was enacted with the purpose, and has the effect, of discriminating against interstate commerce.

Texas legislators and officials repeatedly stated that a purpose of SB 261 is to protect Texas agriculture from competition from an out-of-state industry. *See* ROA.291–94 (collecting evidence). The lead House sponsor said the bill's "goal" was "to protect our agriculture industry."[3] Immediately before the House vote, he said, "A vote today is in support of our cattle raisers and our meat producers, and I urge you to vote with me."[4] The official Statement of Intent warned that cultivated meat "could disrupt traditional livestock markets" and said the bill would "support traditional agriculture."[5] And the Texas Department of Agriculture described the law as a choice to "safeguard our real, authentic meat industry from synthetic alternatives" because "picking winners and losers is exactly what's at stake—and Texas will always choose its farmers and ranchers."[6, 7] The only testimony in favor of SB

[3] Tex. House of Representatives, 89th Legis. Session, at 7:42:20–30 (May 24, 2025), https://house.texas.gov/videos/22257.

[4] Tex. House of Representatives, 89th Legis. Session, at 36:15–24 (May 25, 2025), https://house.texas.gov/videos/22258.

[5] Senate Rsch. Serv., Bill Analysis (Mar. 25, 2025), https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00261I.pdf.

[6] Tex. Dep't of Agric., Commissioner Miller Praises Tx. Legis for Putting a Fork in Lab-Grown Meat (June 26, 2025), https://texasagriculture.gov/News-Events/Article/10442/COMMISSIONER-MILLER-PRAISES-TEXAS-LEGISLATURE-FOR-PUTTING-A-FORK-IN-LAB-GROWN-M.

[7] Tex. Dep't of Agric., Texas Agriculture Commissioner Sid Miller Blasts Lab-Grown Meat Ruling (Jan. 21, 2026), https://texasagriculture.gov/News-Events/News-Events-Details/Article/10747/Texas-Agriculture-Commissioner-Sid-Miller-Blasts-Lab-Grown-Meat-Ruling-Texas-Wi.

261 came from the Texas & Southwestern Cattle Raisers Association, which reiterated the law's protectionist purpose. *See* ROA.293–94.

Consistent with this evidence, the government has conceded that "the legislative record contains statements expressing that the purpose of SB 261 was, in part, to protect the Texas agricultural industry." ROA.441. That acknowledgment is telling: "Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994).

The historical background reinforces that direct evidence. SB 261 did not arise in isolation: it followed Texas's recent enactment of SB 664, which singled out plant-based analogue meat products for special labeling requirements. A federal district court later held the challenged provision unconstitutional and facially enjoined it. *See Turtle Island Foods Inc. v. Shuford*, 818 F. Supp. 3d 846 (W.D. Tex. 2026). Against that background, the repeated protectionist statements, the law's operation, and the State's own concession readily show that protectionism was at least a motivating factor.

Finally, the structure of the law confirms its discriminatory purpose. SB 261 bans only the sale and offer for sale—but not manufacture, possession, free distribution, or consumption—of cultivated meat. There is no legitimate health-and-safety

reason why cultivated meat becomes dangerous only when exchanged for money. Allowing manufacture and possession may facilitate research, but it does not explain why consumers may receive and eat the product for free. If consumption creates the asserted risk, that risk is identical whether the consumer pays or not. That underinclusiveness is evidence that the law's real target is economic competition, not food safety. *See Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 671 n.12 (1981) (plurality opinion) (observing that the law's structure undermined the State's asserted safety rationale).

In sum, SB 261 was enacted with a discriminatory purpose, as illustrated by the statements of Texas legislators and officials, the historical background, the State's concession about the purpose of SB 261, and the structure of the law. SB 261 is therefore subject to heightened scrutiny. *See Maine v. Taylor*, 477 U.S. 131, 138 (1986); *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 596 (8th Cir. 2003).

The State's various arguments for avoiding this conclusion all fail. First, the State Defendants insist there are only a few stray remarks of protectionism and invoke health and safety as a separate purpose. Resp. Br. at 24–28. But the protectionist evidence is not limited to isolated comments: it includes the lead sponsor, the official Statement of Intent, the Department of Agriculture, the only testimony in favor, the statute's structure, and the State's concession. This case therefore differs

from *Allstate*, where a few protectionist statements accompanied "extensive testimony" regarding non-protectionist concerns. *See* 495 F.3d at 156 n.4, 161. More to the point, discriminatory purpose need not be the State's only purpose; it need only be a substantial or motivating factor. *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019). That is the case here.[8]

Second, the State Defendants insist "the purpose of S.B. 261 is to protect Texas residents against the imperfectly understood risks of consuming cultivated meat." Resp. Br. at 26–28. But it is implausible that the Texas legislature was concerned about an unknown risk associated with cultivated meat that has been purchased as opposed to given away freely. Even assuming legislators shared that concern, there is extensive evidence of discriminatory purpose. Again, discriminatory purpose need not be the only reason for the law. *Wal-Mart Stores*, 945 F.3d at 214; *see Kassel*, 450 U.S. at 670 (plurality opinion) (invoking "public health or safety does not insulate a state law from Commerce Clause attack").

Third, the State Defendants say that Wildtype and UPSIDE must prove discriminatory purpose *and* discriminatory effect. Resp. Br. at 28–30. The Supreme Court, however, has said that a law can violate the dormant Commerce Clause "on

[8] The State points to BioBQ, an Austin-based company that is not authorized to sell a cultivated-meat product. Resp. Br. at 28–29. BioBQ therefore is not a participant in the existing interstate market SB 261 forecloses. More fundamentally, the favored interest is Texas's conventional-agriculture industry, not a hypothetical future in-state cultivated-meat seller.

the basis of *either* discriminatory purpose . . . *or* discriminatory effect." *Bacchus*, 468 U.S. at 270 (emphasis added). This Court has likewise framed the inquiry in the disjunctive. *See Allstate*, 495 F.3d at 160; *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 327 (5th Cir. 2022).

Fourth, the State Defendants say cultivated meat and conventional meat do not compete. The State Defendants, however, appear to acknowledge that cultivated meat is a type of meat product. *See* Resp. Br. at 3, 5, 34. Indeed, the unrebutted record shows that some people prefer cultivated meat as a substitute for conventional meat. *See* ROA.322 (¶¶ 24–29), 361 (¶¶ 25–30). In practice, that is how the market plays out. At a sushi restaurant in Austin, people tried Wildtype's cultivated salmon with their sushi instead of conventional salmon. *See* ROA.322 (¶ 29). Even so, the best confirmation that cultivated meat competes with conventional meat is what Texas lawmakers, officials, and interest groups say: Cultivated meat is a threat to the Texas agricultural industry. *See supra*, at 8–9.

Finally, the State Defendants emphasize the industry's current size and call any effect on interstate commerce de minimis. Resp. Br. at 31–34. But in *Bacchus*, "well under one percent" of annual sales was enough to constitute "some competition." 468 U.S. at 268–71. The State's distinctions—that *Bacchus* involved a facial exemption, stipulated facts, and predated *General Motors Corp. v. Tracy*, 519 U.S. 278

(1997)—do not alter that principle: market volume bears on the extent of discrimination, not its existence. SB 261 leaves every existing interstate seller with no compliance path. The reason cultivated meat did not have a large share of the market in Texas is because of the government, not consumers. SB 261 banned the out-of-state innovation soon after the FDA gave Wildtype and UPSIDE the green light—i.e., before the startups could fully compete in the marketplace. *See* ROA.323 (¶ 32). A State cannot ban an emerging competitor before it develops market share and then cite its small pre-ban market as a defense. Nor does the two-year sunset make total exclusion incidental; duration affects the amount of commerce discriminated against, not the character of the discrimination.

**b. SB 261 fails heightened scrutiny.**

Once a state law discriminates against interstate commerce by purpose or effect, the burden falls on the State to show both that the law serves a legitimate local purpose and that the purpose cannot be served as well by available nondiscriminatory alternatives. *Maine*, 477 U.S. at 138; *Allstate*, 495 F.3d at 160; *see* Resp. Br. at 24, 34. That is a heavy burden. Discriminatory laws are subject to a "virtually *per se* rule of invalidity." *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 100 (1994); *see S.D. Farm Bureau*, 340 F.3d at 596–98 (same). Texas cannot satisfy either part of

that burden. It has no evidence of a concrete health risk, and it has no evidence that available nondiscriminatory alternatives would fail.

The State Defendants offer a single purpose for SB 261: "to protect Texas residents against the imperfectly understood risks of consuming cultivated meat." Resp. Br. at 26–28, 34–35. Under Supreme Court precedent, it is not enough to merely say the law is "a health measure." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951). Instead, the State Defendants must produce "concrete evidence" that the law actually promotes those interests and that nondiscriminatory alternatives are inadequate. *Wal-Mart Stores*, 945 F.3d at 213; *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 540 (2019); *see, e.g.*, *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 364–67 (1992).[9]

The government has not produced concrete evidence. Instead, the State Defendants cite legislative statements and testimony that speculate that cultivated meat could be harmful. But "speculation or unsupported assertions of fact are insufficient to validate an otherwise discriminatory law." *Wal-Mart Stores*, 945 F.3d at 213 (cleaned up); *see New Energy Co.*, 486 U.S. at 280. Not a single Texas official or legislator identified a study regarding the health and safety of cultivated meat. The De-

[9] The State suggests that the requirement of "concrete evidence" is peculiar to alcohol cases. Resp. Br. at 36–37. It cites no decision imposing that limitation. Whatever terminology is used, Supreme Court precedent requires evidence—not speculation—to justify discrimination against interstate commerce. *See Maine*, 477 U.S. at 141–52; *Dean Milk*, 340 U.S. at 354–56.

partment of State Health Services resource witness said she did not "have any information" on why cultivated meat would be a public-health risk. Resp. Br. at 11. By contrast, Wildtype and UPSIDE completed FDA premarket consultations, the FDA issued no-questions letters, neither company has had a recall or received a health-related complaint, and both startups are subject to routine federal oversight. Opening Br. at 8, 24.

Undeterred, the State Defendants lean on *Maine v. Taylor*. But Maine upheld its ban only after evidence showed concrete pathways of harm—identified parasites and nonnative species—and that available inspections could not screen them out. 477 U.S. at 141–52. The Court described the imported baitfish as "particularly likely" to threaten Maine's fisheries. *Id.* at 148 n.19. Here, the State has identified no comparable pathway or evidence that Wildtype and UPSIDE's products are particularly likely to harm anyone.

Finally, the government briefly argues it could not choose a nondiscriminatory alternative to address its stated purpose of protecting health and safety. In its view, labeling, disclosures, and studies are not viable alternatives because it is "unknown" whether cultivated meat "is safe to eat in the long run." Resp. Br. at 37. That does not follow. Texas could study cultivated meat without banning the sale of it. It could enforce its food-safety laws on the books. And it could require a disclosure that the

product is cultivated meat. But Texas chose the most extreme option—a sales ban backed by criminal penalties—to protect an in-state industry from out-of-state competition and without offering more than speculation and conjecture. That is unconstitutional.

### B. Wildtype and UPSIDE independently established irreparable economic harm.

If this Court agrees that the district court applied the wrong preliminary injunction standard, it can reverse and remand for the district court to reach the merits. The merits, in turn, will affect the analysis of irreparable harm and the balance of equities. But even setting aside the standard, the district court erred by concluding there is no irreparable harm and that the balance of equities does not favor relief.

SB 261 has caused Wildtype and UPSIDE to suffer unrecoverable economic injuries in the form of lost revenue and lost business opportunities. Opening Br. at 28–34. Because of SB 261, Wildtype and UPSIDE no longer have access to revenue from Texans and the business opportunities in Texas they were pursuing. ROA.325–26 (¶¶ 45–50), 364 (¶¶ 46–51). These losses are irreparable because "they cannot be recovered 'in the ordinary course of litigation.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Texas v. EPA*, 829 F.3d 405, 434 & n.41 (5th Cir. 2016)). Sovereign immunity forecloses damages against the State Defendants. *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir.

2023); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). The two-year sunset does not make those lost sales and opportunities recoverable.

The State Defendants ignore this Court's precedent in *Clarke* and *Wages & White Lion*. They instead argue there is no irreparable harm because Wildtype and UPSIDE's "economic injuries are negligible." *See* Resp. Br. at 17, 50. That is wrong on both the facts and the law.

On the facts, before SB 261, Wildtype and UPSIDE received revenue in Texas, developed future business relationships in Texas, and seized upon one-time opportunities to present and sell their products in Texas. *See* Opening Br. at 31. After SB 261, those relationships cannot result in lawful sales, and those opportunities have been halted. That result threatens continued investments, makes it harder to achieve economies of scale and compete with conventional meat producers, and undermines the national common market. *See* ROA.323 (¶ 30), 326–27 (¶¶ 53–54, 57), 361–62 (¶ 31), 365 (¶¶ 54–56), 366 (¶ 59). For startups, these are existential threats. The State's unsupported speculation that Wildtype entered Texas to manufacture this challenge does not make its lawful sales or resulting losses hypothetical.

On the law, there is no "negligible" exception to irreparable harm. *See* Opening Br. at 31–32. For irreparable harm, "it is not so much the magnitude but the irreparability that counts." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th

220, 238 (5th Cir. 2024) (quoting *Texas v. EPA*, 829 F.3d at 433–34). Here, Wildtype and UPSIDE's injuries are irreparable because they cannot recover their economic damages. *See supra*, at 16–17. Under this Court's precedent, it does not matter whether the harm *seems* small. *See Louisiana v. Biden*, 55 F.4th 1017, 1034–35 (5th Cir. 2022) ("only one percent"); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir. 1982) ("a single trade secret"). What matters is that the harm is irreparable. Indeed, under the State Defendants' proposed rule, a startup does not suffer irreparable harm so long as the state bans the product before the startup can ramp up its business. There is no authority for that sweeping carve-out from irreparable harm.

In lieu of addressing *Clarke* and *Wages & White Lion*, the State Defendants also advance a second argument: Wildtype and UPSIDE's injuries flowing from conversations with potential customers are speculative because it is unclear whether those contacts "will materialize." Resp. Br. at 50. But the record shows their business efforts were materializing. Before SB 261, both startups sold and distributed cultivated meat in Texas. ROA.324–25 (¶¶ 36–40), 363 (¶¶ 39–41). Wildtype spoke with potential customers in Texas that were interested in its cultivated salmon, including by taking six sales trips to Austin. ROA.324–25 (¶¶ 41–42). And UPSIDE spoke with chefs and supermarket chains in Texas that were interested in selling UPSIDE's cultivated poultry. ROA. 363 (¶¶ 42–43); Opening Br. at 30 n.1. SB 261

ended those opportunities. ROA.325–26 (¶¶ 46–47, 49–50), 364 (¶¶ 47–48, 50–51). There is nothing speculative about a business being shut out of a state after expending considerable time, effort, and money to build on their prior sales.

Because Wildtype and UPSIDE are suffering unrecoverable economic injuries—along with their ongoing constitutional injury—the district court erred by concluding there is no irreparable harm.

### C. The balance of equities and public interest favor preliminary relief.

The district court also erred by concluding the balance of equities does not favor preliminary relief. An injunction is in the public interest because SB 261 is unconstitutional, the public has a strong interest in the free flow of goods in the national marketplace, there are negative downstream effects, and the State has no legitimate interest or harm. Opening Br. at 40–43.

In response, the government asserts an interest in keeping Texans safe from "the imperfectly understood risks of consuming cultivated meat." Resp. Br. at 50–51. Invoking health and safety is not a magic wand. *See Dean Milk*, 340 U.S. at 354; *Kassel*, 450 U.S. at 670 (plurality opinion). And Texas has provided no concrete evidence of a health risk. The government also minimizes Wildtype and UPSIDE's interests as "not so weighty." Resp. Br. at 51. But Wildtype and UPSIDE are startups seeking to build a national market, so exclusion from Texas and the resulting

market fragmentation pose potentially existential threats. It does not matter that they could sell cultivated meat only briefly before SB 261 took effect. *See* Opening Br. at 32–33 & n.2. Startups are not too small for the Constitution to apply. Besides, Texas has no legitimate interest in enforcing an unconstitutional law. *Space Expl.*, 151 F.4th at 780; *Ass'n for Accessible Meds.*, 140 F.4th at 961.

The balance of equities favors preliminary relief, and neither the district court nor the State Defendants offer any basis for concluding otherwise.

## II. UPSIDE is likely to succeed on its PPIA preemption claims.

The district court also erred by denying UPSIDE preliminary relief on the basis that SB 261 is not preempted by the PPIA. The PPIA expressly preempts state requirements regarding the permissible ingredients in poultry products and the processes by which they are manufactured. A state law that differs from a federal requirement made "under" the PPIA "may not be imposed by any State." 21 U.S.C. § 467e. Because Congress adopted an express preemption clause, this Court does not apply a presumption against preemption; it focuses on the clause's plain text. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023) (citing *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)).

Here, SB 261 imposes different requirements than those made under the PPIA, so it is preempted. Opening Br. at 43–56. Texas agrees that UPSIDE has an

official establishment and does not dispute that its cultivated poultry is a poultry product. Resp. Br. at 38 n.9. Instead, the government argues that SB 261 does not impose additional or different requirements concerning UPSIDE's onsite operations and ingredients, and that the PPIA's preemption provisions do not apply to end-product sales bans. Neither of these arguments has merit.

### A. SB 261 imposes additional or different requirements concerning UPSIDE's onsite operations and ingredients.

First, the State Defendants insist the PPIA's Facilities Clause does not apply because SB 261 does not affect UPSIDE's premises, facilities, or operations. Resp. Br. at 17, 39–46. SB 261, however, bans a poultry product because of how it is produced in a federally regulated facility through a process that federal law permits: cell cultivation. Specifically, federal law permits UPSIDE to harvest cultivated chicken cells into a finished poultry product within its official establishment. *See* Opening Br. at 51 (citing FSIS Directive 7800.1, at 1–2; ROA.363 (¶ 38)). SB 261, by contrast, defines the banned product by the same process: "harvesting animal cells." Tex. Health & Safety Code § 431.002(5-a). Federal law thus permits UPSIDE to use cell cultivation within its official establishment to produce a federally inspected poultry product, while Texas makes the resulting product unsalable precisely because UPSIDE used that federally permitted operation. Because SB 261 imposes an "addition[al]" or "different" requirement "with respect to" UPSIDE's "premises, facil-

ities and operations," it is preempted by the PPIA's Facilities Clause. 21 U.S.C. § 467e.

Second, the State Defendants argue SB 261 does not ban an ingredient, so it is not preempted by the PPIA's Ingredients Clause. *See* Resp. Br. at 17, 46–49. Yet SB 261 bans a poultry product because it contains a specific ingredient: cultivated chicken cells. Cultivated chicken cells are an "ingredient" under the PPIA because those cells are "physical components that comprise a poultry product." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017). Most importantly, UPSIDE's federally approved label describes its poultry product as made "from chicken cells" with "cell-cultivated chicken" as its primary ingredient. *See* ROA.27, 363 (¶ 38). So both the ordinary meaning of "ingredient" and the federally approved label confirm that cultivated cells are ingredients under the PPIA.

SB 261, by contrast, targets food products that are "derived from" those same "animal cells." *See* Tex. Health & Safety Code § 431.002(5-a). Federal law permits UPSIDE's federally inspected poultry product to contain cultivated chicken cells, which its approved label identifies as the product's primary ingredient. Texas forbids the sale of the product precisely because it contains that ingredient. Because SB 261 imposes an "addition[al]" or "different" "ingredient requirement[] . . . with respect

to articles prepared at [UPSIDE's] official establishment," it is preempted by the PPIA's Ingredients Clause. 21 U.S.C. § 467e.

Attempting to narrow the PPIA's broad preemptive sweep, the State points to the law's saving clause. But that clause does not justify a narrower rule. It preserves state action only as to "other matters" and only when "consistent with" the PPIA. The concurrent-enforcement provision likewise permits States to prevent distribution of products that are adulterated or misbranded under federal standards, not to create additional state standards. *See Armour & Co. v. Ball*, 468 F.2d 76, 84–85 (6th Cir. 1972); *Nat'l Broiler Council v. Voss*, 44 F.3d 740, 746 (9th Cir. 1994). The government's attempted reliance on *Williams v. Wingrove* also does not narrow the PPIA in any way that helps the State. That case held worker-safety duties outside the PPIA because they lacked a connection to poultry-product safety or adulteration. 153 F.4th 455, 463–64 (5th Cir. 2025). Texas, by contrast, defends SB 261 as a food-safety law.

### B. Texas cannot avoid preemption by characterizing SB 261 as an end-product sales ban.

Texas tries to escape the PPIA's preemption provision by characterizing SB 261 as an end-product sales ban that, it contends, is not subject to preemption. Resp. Br. at 42–44. These arguments fail. In *National Meat Association v. Harris*, the Supreme Court rejected the idea that "any State could impose any regulation on

slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." 565 U.S. 452, 464 (2012). Texas banned the sale of a poultry product produced in a federally approved way that Texas disapproves—using cultivated chicken cells as an ingredient to produce a poultry product. *National Meat* forecloses that maneuver. Texas may not regulate UPSIDE's federally supervised processing operation merely by recasting its operational restriction as a prohibition on sale.

True, the Eleventh Circuit reached a different conclusion regarding the PPIA by characterizing Florida's law as banning an "end product" rather than regulating ingredients, premises, facilities, or operations. *UPSIDE Foods Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 171 F.4th 1239, 1256–57 (11th Cir. 2026). But that erroneous ruling "would nullify" the PPIA's "preemption clause and the uniformity that Congress" wanted for the ingredients of poultry products and the facilities in which they are produced. *See Monsanto Co. v. Durnell*, No. 24-1068, 2026 WL 1825691, at *9 (U.S. June 25, 2026). The Supreme Court's recent FIFRA decision confirms the textual problem with the Eleventh Circuit's approach. When Congress intended to preserve state authority to "regulate the sale or use of federally" regulated products—including through outright bans—it said so expressly. 7 U.S.C.

§ 136v(a); *see Monsanto*, 2026 WL 1825691, at *5 n.2. The PPIA contains no comparable reservation.

Ultimately, the government's characterization of SB 261 as a sales ban stems from a flawed analogy between bans on cultivated meat and bans on horse meat. Resp. Br. at 42–43. Texas has not banned the slaughter of chickens for human consumption as it has banned the slaughter of horses. Instead, SB 261 seeks to control what official establishments may do after chicken tissue has entered a federally regulated facility. *See* Opening Br. at 53–55. The horsemeat cases concerned whether a species could be brought to slaughter at all. But once chicken tissue has entered an official establishment and become subject to federal regulation, Texas cannot impose a different requirement governing how the establishment processes that tissue. That distinction also harmonizes *Canards* with *National Meat*. *Canards* concerned force-feeding during animal husbandry, before the birds reached an official establishment.

Under federal law, UPSIDE may cultivate the cells and process the harvested cells into a poultry product; Texas makes that product unsalable because of that processing. That is the operational domain *National Meat* holds preempted.

## CONCLUSION

This Court should reverse the district court's denial of Wildtype and UPSIDE's motion for preliminary injunction and remand.

Dated: July 23, 2026.

Respectfully submitted,

*/s/ Marco Vasquez Jr.*

**INSTITUTE FOR JUSTICE**

Marco Vasquez Jr.
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
mvasquez@ij.org

Paul Sherman
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
psherman@ij.org

*Counsel for Plaintiffs-Appellants*
*Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2026, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service on all counsel of record will be accomplished by the appellate CM/ECF system.

*/s/ Marco Vasquez Jr.*
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 5,918 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2024 in 14-point Equity A font.

*/s/ Marco Vasquez Jr.*
*Counsel for Plaintiffs-Appellants*